## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

PHARMACEUTICAL RESEARCH
AND MANUFACTURERS OF
AMERICA,

    *Plaintiff*,

        v.

GENTNER DRUMMOND, in his
official capacity as Attorney General
of the State of Oklahoma,

    *Defendant*.

Case No. _____

## COMPLAINT FOR DECLARATORY AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

## [REQUEST FOR IMMEDIATE RELIEF]

1.      Oklahoma House Bill 2048 ("H.B. 2048"), to be codified in the Oklahoma Statutes as Section 5400 et seq. of Title 36,[1] violates the United States Constitution's Supremacy Clause, prohibition on extraterritorial regulation, and bar on vague laws. Plaintiff Pharmaceutical Research and Manufacturers of America ("PhRMA") brings this Complaint and states as follows:

## PRELIMINARY STATEMENT

2.      The basic question in this case is whether states can alter the terms of participation in a federal program, enacted pursuant to Congress's Spending Power, in ways that differ from the ones Congress imposed and to which the participants agreed.  The answer under the Supremacy Clause is no.  *See* Order, *AbbVie Inc., et al. v. Drummond*, No. 25-cv-726-PRW (W.D. Okla. Oct. 31, 2025), ECF No. 79 (preliminarily enjoining H.B. 2048 as likely preempted); *Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 453-60 (S.D. W. Va. 2024) (preliminarily enjoining similar state law as likely preempted).

3.      The state law at issue here, H.B. 2048, is Oklahoma's attempt to rewrite the terms of a federal program known as the 340B Drug Pricing Program, 42 U.S.C. § 256b ("340B").  As this Court has already concluded, H.B. 2048 directly conflicts with 340B. *See AbbVie* Order at 11-20.

---

[1] The provisions were enacted as H.B. 2048 §§ 1-6 and will be codified in Title 36 of Oklahoma's compiled statutes, called the "Oklahoma Insurance Code." *See* Okla. Stat. tit. 36, § 101.  Hereinafter, unless otherwise indicated, "H.B. 2048" shall refer to the challenged provisions, Sections 4 and 5(B).

4.      The Court's conclusion is well-supported, particularly given that H.B. 2048 directly regulates the terms of participation in a federal program. 340B is a creature of Congress's Spending Power.  "Through Medicare and Medicaid, [the federal government] pays for almost half the annual nationwide spending on prescription drugs." *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023).  The federal government thus has extraordinary leverage to use the promise of federal funding under those programs to get drug manufacturers to agree to terms it could not impose on them directly.  And Congress "uses that market power to get drug makers to subsidize healthcare." *Id.*

5.      In particular, through the federal 340B program, "[a]s a condition of participating in Medicare Part B and Medicaid, [Congress] requires drug manufacturers to sell certain drugs . . . at bargain prices" to certain enumerated types of healthcare providers ("covered entities").  *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 455 (D.C. Cir. 2024).

6.      Congress could not do this outside the terms of a federal spending program. Indeed, in any other context, a law (federal or state) that simply compelled private parties to offer to sell their property for pennies on the dollar would raise serious constitutional concerns.  But "Congress may 'regulate where it otherwise could not'—beyond its enumerated powers, in other words—by imposing conditions on federal funds," provided the recipients "consent to the bargain." *Ali v. Adamson*, 132 F.4th 924, 930-31 (6th Cir. 2025); *see also, e.g.*, *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545

(1983).[2]  And that is precisely what Congress has done, by making participation in the 340B program  one of the "condition[s] of participating in Medicare Part B and Medicaid," *Novartis*, 102 F.4th at 455, that "define the limits of th[os]e government spending program[s]," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013); *Rumsfeld v. F. for Acad. and Inst. Rts., Inc.*, 547 U.S. 47, 59 (2006).

7.     Because 340B is part of a Spending Power program, the obligations it imposes on manufacturers who participate in Medicare and Medicaid must be imposed "unambiguously" by Congress.  *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219-20 (2022) (holding that a recipient of federal funds must know not only "what rules it must follow" but "also what sort of penalties might be on the table"); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (holding that, for Spending Power legislation, the question is whether the legislation "furnishes clear notice regarding the liability at issue").

8.     But, through H.B. 2048, Oklahoma is seeking to add more obligations on top of the ones Congress imposed and manufacturers agreed to, requiring drug manufacturers to offer steep price reductions even where federal law and manufacturers' federal contracts under 340B do not require them to do so.  *See AbbVie* Order at 13 (H.B. 2048 "requires manufacturers to deliver drugs to contract pharmacies at a discounted price when they would otherwise be delivered at full price," thus directly "regulating pricing"); *id.* at 15

---

[2] Conditions must also bear a nexus to the program enacted, and the inducement must not be coercive.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581-82 (2012); *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987).

("Congress limited the scope of the 340B Program to ensure that the price of admission wasn't too high, which might have the deleterious effect of causing drug manufacturers to opt out of Medicaid and Medicare Part B.").

9.      H.B. 2048 therefore violates the Supremacy Clause.  The Supreme Court has long and consistently rejected state efforts to regulate a program or relationship that "originates from, is governed by, and terminates according to federal law."  *Buckman Co. v. Plaintiffs' Legal Comm*., 531 U.S. 341, 347 (2001); *see also, e.g.*, *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-13 (1988) (holding that state tort law cannot be used to hold federal contractors liable for design defects in contracted-for military equipment).  That describes the federal 340B program to a T:  It is created entirely by federal statute, *see* Pub. L. No. 102-585, § 602, 106 Stat. 4,943, 4,967 (1992); Pub. L. No. 111-148, §§ 7101-02, 124 Stat. 119, 821-27 (2010) (both codified at 42 U.S.C. § 256b); it is governed only by federal law and administered exclusively by a federal agency, the U.S. Department of Health and Human Services ("HHS"), *see Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 119-20 (2011); and federal law exclusively dictates who must participate in the program and when, *see* 42 U.S.C. §§ 256b(a)(1), 1396r-8(a)(1).  And H.B. 2048 does nothing *other* than regulate participation in the federal 340B program.

10.      To be sure, states may require private parties that participate in federal programs to comply with generally applicable state laws (at least so long as they do not conflict with parties' federal-law obligations or are otherwise preempted).  But states do not traditionally have the power to directly regulate the federal program or relationship itself.  *See, e.g.*, *Buckman*, 531 U.S. at 348 (holding state-law claims for fraud on a federal

agency preempted). For that reason alone, "no presumption against pre-emption obtains in this" context. *Id.* at 347. Quite the opposite: as in cases like this one, a state's direct targeting of a federal program "changes what would otherwise be a conflict that cannot produce pre-emption into one that can" because of the uniquely federal interest in "obligations to and rights of the United States." *Boyle*, 487 U.S. at 504, 507-08.

11.     H.B. 2048 is not even arguably a law of general applicability; it is targeted *only* at the federal 340B program—for which Congress mandated manufacturer participation as a condition of federal reimbursement under its Spending Power authority—and *only* at drug manufacturers who sign the federal agreement to opt into that program. In other words, H.B. 2048 is directly aimed at, and parasitic to, the federal 340B program. It imposes its additional obligations on a drug manufacturer if—and only if—it participates in 340B, mandating that manufacturers provide federal 340B pricing in a range of circumstances where federal law and manufacturers' federal contracts under 340B do not require them to do so. That sort of direct targeting of a federal program is not within a state's power under our federal constitutional system. *Cf. South Carolina v. Baker*, 485 U.S. 505, 523 (1988) (states cannot target for special regulation "the United States or those with whom it deals"); *Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738, 786-89, 866-67 (1824); *Crandall v. Nevada*, 73 U.S. (6 Wall.) 35, 44-45 (1867); *Okla. Tax Comm'n v. Tex. Co.*, 336 U.S. 342, 364 (1949).

12.     Ultimately, Oklahoma is trying to alter, *ex post*, the bargained-for consideration of an exclusively federal contract, by requiring drug manufacturers to offer steeply reduced pricing even when the 340B program does not require them to do so.

Indeed, it is even worse than that. Not only does H.B. 2048 impose obligations on federal 340B participation that federal courts have repeatedly held that the federal agency charged with overseeing the 340B program (HHS) cannot itself impose, it also will saddle HHS with burdens that Congress deemed too onerous by radically expanding the scope of the federal program that that agency must oversee. Because nothing in the federal statutes governing the 340B program even purports to give states the power to alter its terms, H.B. 2048 is far beyond Oklahoma's authority and is preempted.

13.    Indeed, even putting aside H.B. 2048's intrusion upon a federal program enacted pursuant to the federal government's Spending Power, the unique features of the 340B program underscore why H.B. 2048 is preempted under more traditional conflict- and field-preemption principles that apply with respect to all federal laws. *See AbbVie Order* at 20 (preliminarily enjoining H.B. 2048 as likely preempted); *Morrisey*, 760 F. Supp. 3d at 453-60 (same).

14.    **First**, H.B. 2048 fundamentally alters the nature of manufacturers' 340B obligation (and thus the bargain between manufacturers and the federal government) by compelling manufacturers to sell at the 340B price in circumstances where Congress does not require them to do so. *AbbVie Order* at 15 (recognizing that "Congress . . . struck a delicate balance with the federal 340B Program"). 340B requires only that drug manufacturers make an "offer" to sell certain of their drugs to covered entities at "strikingly generous" prices—sometimes as low as "penn[ies] per unit." *Novartis*, 102 F.4th at 456; 42 U.S.C. §§ 256b(a)(1)-(4). Covered entities, in turn, are limited in what they can do with 340B-priced drugs: By statute, they are barred from selling *or* transferring 340B-priced

drugs to anyone other than their patients, which is known as "diversion."  42 U.S.C. § 256b(a)(5)(B).  Although pharmacies are not among the enumerated covered entities under 340B, for-profit pharmacies, referred to as "contract pharmacies," now routinely team up with covered entities to seek access to 340B-priced drugs to make additional profit.

15.     Two federal appellate courts have made clear that manufacturers do not have to offer or agree to provide 340B-priced drugs to all contract pharmacies of covered entities.  The 340B program instead leaves manufacturers free to attach reasonable conditions to their 340B offers, including restrictions limiting the number of contract pharmacies to which manufacturers will provide 340B-priced drugs and requirements that covered entities submit claims data for 340B-priced drugs.  *Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 703-06.  That "bona fide" offer framework, as explained in *Novartis*, establishes the scope of the obligation that Congress has imposed on manufacturers to provide 340B-priced drugs.  102 F.4th at 460-64.  Under federal law, manufacturers do not have to provide their drugs at the 340B price to a covered entity's contract pharmacies if the covered entity refuses to assent to the manufacturer's contract pharmacy conditions. *See id.*

16.     Put simply, under federal law, manufacturers are free to include reasonable conditions regarding contract pharmacies in their 340B bona fide offers, and to refuse to sell at the 340B price where those conditions are not accepted.

17.     The whole point of H.B. 2048 is to displace that framework, by outlawing the very same conditions that federal courts have repeatedly affirmed manufacturers are free to impose.  H.B. 2048 thus compels 340B-priced sales in circumstances where

Congress did not require and manufacturers did not agree, increasing dramatically manufacturers' cost of participation in 340B (and by extension, Medicare and Medicaid). *See AbbVie* Order at 14 (holding that H.B. 2048 regulates "the *price* at which [the] drugs must be sold").

18.    By compelling 340B sales that would not occur in the absence of H.B. 2048, the state law directly conflicts with both the mechanism Congress chose to operationalize the 340B program and the effect under federal law of a manufacturer agreeing to the program's conditions. *Id.* at 11-16. In operation, H.B. 2048 attempts to override Congress's choice to implement 340B through an "offer" framework that allows manufacturers to impose reasonable conditions, including contract pharmacy limitations, on their offers. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987) (holding state law that "interfere[d] with the methods by which the federal statute was designed to reach [its] goal" preempted).

19.    In effect, H.B. 2048 would expand the scope of manufacturers' 340B obligations (otherwise the law would serve no purpose), fundamentally altering the bargain struck by Congress for manufacturer participation in 340B. *See, e.g.*, *id.* (finding state law preempted because it "upset[] the balance of public and private interests so carefully addressed by the [federal statute]"); *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 531 (5th Cir. 2013) (laws that "interfere[] with the careful balance struck by Congress" are conflict preempted); *Forest Park II v. Hadley*, 336 F.3d 724, 730, 732-33 (8th Cir. 2003) (holding that where Congress enacts a program that relies on participation by private parties via incentives and sets the obligations of those private

parties under the program, additional state obligations conflict with the federal scheme, whether or not they purportedly serve the same "purpose").

20.    Indeed, even the lead sponsor of the bill that ultimately became H.B. 2048 acknowledged that H.B. 2048 operates in a unique federal space: "It absolutely should be addressed on the federal level."  Testimony of Rep. Preston Stinson Before the Okla. H. Judiciary & Pub. Safety Oversight Comm. Hr'g Mar. 6, 2025 at 10:54-55.[3]  And when vetoing H.B. 2048, Oklahoma Governor Kevin Stitt expressed his concern about the bill's intrusion into federal law:

> The program addressed in HB 2048 is in deep need of reform at the federal level to improve transparency. . . .  I do not believe it is the job of the legislature to insert itself into a contractual dispute and try to pick winners and losers.

Gov. J. Kevin Stitt, Gov. Stitt's 2025 Veto List, Okla. Off. of the Governor (last modified June 4, 2025), https://tinyurl.com/2r2c8bnp.

21.    This expansion of 340B beyond federal bounds is lining the pockets of for-profit pharmacies and administrators, which were never intended to benefit from 340B.

22.    **Second**, although it is essential to 340B's functioning that manufacturers have access to information on the specific prescriptions for which 340B price reductions are sought, H.B. 2048 attempts to conceal that information.  It does so by prohibiting manufacturers from "interfer[ing] with, either directly or indirectly, the acquisition of a

---

[3] Audio available at https://sg001-harmony.sliq.net/00283/Harmony/en/PowerBrowser/PowerBrowserV2/20250306/-1/55009.

340B drug by, or delivery of a 340B drug to a 340B entity." H.B. 2048 § 4(A); *AbbVie* Order at 17 ("Oklahoma has also stipulated that H.B. 2048 prohibits manufacturers from conditioning the delivery of the 340B discount on the provision of claims data from covered entities and contract pharmacies"). This restriction has the effect of impairing the exercise of manufacturers' federal audit rights and directly interferes with 340B's specific remedial provisions. *See AbbVie* Order at 18 (holding H.B. 2048's "barrier to access [claims] data . . . stands in direct conflict with the 340B Program's dispute resolution mechanism"); *Morrisey*, 760 F. Supp. 3d at 450-53 (holding similar state law that barred collection of claims data was preempted because it conflicted with manufacturers' 340B audit rights); *Eli Lilly & Co. v. Kennedy*, No. 24-cv-03220, 2025 WL 1423630, at *2-4, *9 n.11, *12-14 (D.D.C. May 15, 2025) (affirming manufacturers' right to "impose data-reporting conditions on covered entities," explaining why claims data is important to maintaining program integrity, and requiring HHS to take it into account when considering how manufacturers can structure their program participation). It further impairs manufacturer compliance with another federal law—the Inflation Reduction Act ("IRA")—as well as the Rebate Model Pilot Program recently initiated by HHS. *Infra* ¶¶ 119-24.

23.    **Third**, H.B. 2048's broad bar on "restrict[ing]" or "interfer[ing]" with the acquisition or delivery of a 340B-priced drug would appear to prohibit manufacturers from utilizing alternative pricing mechanisms, known as the "rebate model," despite rebates being explicitly permitted under federal statute and under the federal Rebate Model Pilot Program, implemented under 340B. *Infra* ¶¶ 119-24, 164.

24. **Fourth**, H.B. 2048's state-law enforcement provisions conflict with the carefully calibrated system created by Congress to ensure 340B compliance and raise the specter of inconsistent adjudications. *See AbbVie* Order at 16-17, 18-20 (holding H.B. 2048's enforcement provisions are likely preempted because they impinge on the federal government's enforcement authority and raise the threat of conflicting adjudications on key issues of federal law); *Morrisey*, 760 F. Supp. 3d at 453-60 (holding similar state law was preempted because it conflicted with 340B's enforcement regime). To start, H.B. 2048 conflicts with 340B's exclusive federal administration and enforcement regime by interposing state decisionmakers. As the Supreme Court's *Astra* opinion makes clear, Congress chose to address 340B disputes between healthcare providers and drug manufacturers by creating a detailed series of federal remedial provisions, administered by HHS. *Astra*, 563 U.S. at 119-20; *AbbVie* Order at 16 (holding that "Oklahoma stands functionally in the same place that the [plaintiff] did in *Astra*, enforcing the 340B Program itself"). The agency itself has concluded that those federal remedies would address exactly the same issues H.B. 2048 seeks to regulate. 89 Fed. Reg. 28,643, 28,649 (Apr. 19, 2024); 42 C.F.R. § 10.21(a). Oklahoma's competing enforcement regime cannot stand. *See* H.B. 2048 § 5; *AbbVie* Order at 19 ("[D]isputes under H.B. 2048 related to the delivery of a '340B drug' necessarily raise a question as to whether the covered entity or contract pharmacy in question was delivered drugs at the discounted rate, which is an attempt by Oklahoma to police potential overcharges").

25. In addition to wresting exclusive control from the federal government, H.B. 2048 also raises the threat of inconsistent adjudications. As the Supreme Court

already explained in *Astra*, "recognizing [covered entities'] right to proceed in court could spawn a multitude of dispersed and uncoordinated lawsuits by 340B entities," wresting control from the federal government and creating "substantial" "risk of conflicting adjudications." 563 U.S. at 120. Among other things, an Oklahoma decisionmaker will need to decide multiple questions of federal law before imposing liability in an enforcement action. 42 U.S.C. § 256b(a)(4)-(5). If Oklahoma and other states are permitted to render decisions on these core federal issues, the uniform federal program will cease to be federal or uniform, again contradicting the Supreme Court's holding in *Astra* that Congress intended exclusively federal agency enforcement. *AbbVie* Order at 19-20 ("Because the analysis is not a mere mechanical application of federal law, the potential for conflicting determinations raises the specter that Congress's intended *uniform* scheme would be derailed.").

26.    In sum: H.B. 2048 attempts to regulate in an exclusively federal field (a program that is the product of Congress's Spending Power) where Congress has already set the terms of participation and obligations incurred via participation and directly conflicts with the federal statute. It is thus preempted under the Supremacy Clause.

27.    Finally, H.B. 2048 violates other constitutional principles as well. It violates the Constitution's territorial constraints on state regulation. Unlike most state laws, H.B. 2048 does not just apply to in-state conduct. Instead, it reaches conduct that occurs outside Oklahoma and directly regulates wholly out-of-state transactions, including those between out-of-state manufacturers and out-of-state distributors. As the recent decision in *Association for Accessible Medicines v. Ellison* confirms, states cannot regulate drug prices

beyond a state's borders, even if the drugs are ultimately delivered into the state. 140 F.4th 957, 958-62 (8th Cir. 2025). H.B. 2048's broad prohibitions on "interference" with the acquisition and delivery of 340B drugs to "340B entities" and "interference" with contract pharmacies generally is also unconstitutionally vague given that the law provides no discernible standard by which manufacturers could conform their conduct or that would constrain enforcement. *See infra* ¶¶ 196-201.

28.    PhRMA brings this action to declare unlawful this improper state intrusion into the federal 340B scheme and to enjoin preliminarily and permanently Defendant from enforcing H.B. 2048 against PhRMA's members and as to the sale of their drugs.

## PARTIES

29.    PhRMA, a trade association representing the nation's leading innovative biopharmaceutical research companies, advocates for policies that encourage the discovery and development of important new pharmaceutical products.

30.    PhRMA's members, which manufacture and sell pharmaceutical products, participate in the federal 340B program and will thus be forced to supply their drugs at steeply reduced prices under H.B. 2048 in circumstances where Congress has not required them to do so or otherwise face significant monetary penalties.

31.    Neither the claims asserted nor the relief sought in the Complaint requires the participation of any individual member of PhRMA.

32.    Defendant Gentner Drummond is the Attorney General of the State of Oklahoma and is sued in his official capacity. The Attorney General is authorized to enforce H.B. 2048 against manufacturers, to impose penalties for violations of H.B. 2048,

and to "establish rules and regulations" interpreting H.B. 2048's provisions about manufacturers. H.B. 2048 § 5(B). The Attorney General maintains his principal office in this district at 313 NE 21st Street, Oklahoma City, OK 73105.

## JURISDICTION AND VENUE

33.    PhRMA's causes of action arise under 28 U.S.C. § 1331, 42 U.S.C. § 1983, and the United States Constitution. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

34.    The Declaratory Judgment Act provides that, in a case of actual controversy within its jurisdiction, a United States court may declare the rights and other legal relations of any interested party seeking such declaration. 28 U.S.C. § 2201(a).

35.    This Court has inherent equitable powers to enjoin the actions of state officials if they contradict the federal Constitution or federal law. *Ex parte Young*, 209 U.S. 123, 159-60 (1908); *accord, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

36.    Venue is proper in this district because this action challenges an Oklahoma law applicable to the sale of PhRMA's members' drugs in this district, and thus H.B. 2048 purports to directly restrict and restrain PhRMA's members' conduct in selling and distributing drugs within this district. 28 U.S.C. § 1391(b)(2).

37.    Substantial amounts of PhRMA's members' drugs are sold under the 340B program to covered entities in this district. For example, HHS's website reflects that there are numerous covered entity sites in the Western District of Oklahoma. *See* HRSA, Covered Entity Search Criteria, https://340bopais.hrsa.gov/SearchCe. The same HHS

website reflects that those covered entities maintain a substantial number of contract pharmacy arrangements, including with contract pharmacies in this district. *Id.* Accordingly, H.B. 2048 is likely to be enforced against PhRMA members in this district.

38.     Venue is also proper in this district because Defendant maintains his principal office in this district.  28 U.S.C. § 1391(b)(1).

## BACKGROUND

### A.     The History of 340B

39.     Congress established 340B in 1992 to restore drug discounts that had been provided voluntarily by manufacturers to a select group of safety-net providers before Congress passed the Medicaid Drug Rebate Program ("MDRP") in 1990.   Indeed, Congress carefully restricted the list of eligible 340B covered entities to certain enumerated types of entities that "provide direct clinical care to large numbers of uninsured Americans."  H.R. Rep. No. 102-384, pt. 2, at 12 (1992) ("House Report").

40.     Prior to the enactment of 340B, drug manufacturers had offered discounts on certain outpatient drugs on a voluntary basis to direct healthcare providers like covered entities.  *See* Nicholas C. Fisher, *The 340B Program: A Federal Program in Desperate Need of Revision After Two-And-A-Half Decades of Uncertainty*, 22 J. Health Care L. & Pol'y 25, 29-30 (2019) ("Prior to the MDRP, drug manufacturers regularly offered discounts to . . . hospitals and other safety net providers").  When Congress passed the MDRP in 1990, that law took the manufacturers' previous *voluntary* "large discounts" to safety net providers and factored it into the calculation of *required* "best price" for purposes of determining Medicaid rebates.  *Id.* at 29-30.  The "unintended consequence" of this

pricing "snafu" was that drug manufacturers were "disincentivized" from continuing to provide the voluntary discounts they had provided to safety net providers prior to the MDRP's passage.  *See id.*; *see also* House Report at 9-10.

41.     Congress created 340B to address the limited problem created by the MDRP's enactment, specifically to restore the discounts that they previously offered voluntarily.  *See* Pub. L. No. 102-585, 106 Stat. 4943, 4962; *see also* House Report at 12. When Congress passed 340B, the legislative history indicates that it intended to restore "discounts to these clinics, programs, and hospitals," *i.e.*, "direct clinical care" entities, which had previously received voluntary discounts.  House Report at 12.

42.     When it passed the 340B law in 1992, Congress estimated that the Program would only include approximately 90 hospitals, 85 family-planning clinics, 120 AIDS-intervention sites, 54 AIDS drug purchasing assistance programs, a network of hemophilia treatment centers with 150 facilities, and 2,225 health centers that qualified to participate. *Id.* at 13.

### B.    The Operation and Growth of 340B

43.     340B has grown dramatically in the intervening years.

44.     With the list price value (*i.e.*, based on wholesale acquisition cost) of 340B purchases rising to $147.8 billion in 2024 alone, 340B has become the second largest government pharmaceutical program, exceeded only by Medicare Part D.  Adam J. Fein, *Drug Channels News Roundup, June 2025*, Drug Channels (June 24, 2025), https://tinyurl.com/4m55984e; Rory Martin & Harish Karne, IQVIA, *The Size & Growth of the 340B Program in 2024* 1, https://tinyurl.com/2xd65y7c.

45.     Congress provided guardrails in the 340B statute to "assure the integrity of the drug price limitation program."  H.R. Rep. No. 102-384(II), at 16 (1992).

46.     340B is supposed to be governed by a federal statutory framework.  Under 340B, in order for their drugs to be eligible for federal reimbursement under Medicare and the federal share of Medicaid, manufacturers "*shall offer*" to each "covered entity" (as delineated by the federal 340B statute) certain outpatient drugs (also specified by statute) at or below a price (again set by statute), *if* such drugs are offered to any other purchasers. 42 U.S.C. § 256b(a)(1).  In other words, manufacturers who participate in Medicare and Medicaid must make a genuine offer to covered entities to purchase drugs at 340B prices. That condition on participation in those federal programs does not include any obligation to provide 340B-priced drugs to an unlimited number of contract pharmacies.  *See infra* ¶¶ 51, 106-114.

47.     Federal law defines "covered entity" for purposes of 340B to mean an entity that "is one of" 15 types of specifically enumerated categories of healthcare providers, 42 U.S.C. § 256b(a)(4), and that meets other specifically enumerated requirements, including that the entity does not engage in an unlawful transfer of 340B-priced drugs and does not seek or cause a duplicate Medicaid discount.  42 U.S.C. § 256b(a)(5).

48.     Federally Qualified Health Centers, children's hospitals, critical access hospitals, sole community hospitals (*i.e.*, hospitals geographically isolated from other hospitals, 42 U.S.C. § 1395ww(d)(5)(D)(iii)), and certain other clinics and hospitals are all specifically defined as "covered entities" eligible to enroll and participate in 340B.  42

U.S.C. § 256b(a)(4); *see also Am. Hosp. Ass'n v. Azar*, 967 F.3d 818, 820-22 (D.C. Cir.

2020).  Retail pharmacies are not among the listed covered entities.

49.     Federal law defines the "ceiling price" for purposes of 340B to mean "the

maximum price that covered entities may permissibly be required to pay for the drug"

under the program.  42 U.S.C. § 256b(a)(1).  That ceiling price is deeply reduced compared

to the drug's market price.

50.     Manufacturers must "offer" their covered outpatient drugs at or below the

applicable "ceiling price" to "covered entities," and only "covered entities" may receive

this pricing under the express terms of federal law.  *See id.*

51.     Identifying the specific obligations imposed by 340B's "shall offer"

provision on drug manufacturers requires the interpretation of 42 U.S.C. § 256b(a)(1).

According to courts that have reviewed this question to date, a drug manufacturer must

provide some meaningful path for covered entities to obtain these medications at the 340B

price.  *See* 42 U.S.C. § 256b(a)(1); *Novartis*, 102 F.4th at 462-64; *Sanofi*, 58 F.4th at 703.

But the statute does not mandate a commitment to provide 340B-priced drugs to an

unlimited number of contract pharmacies that a covered entity insists on using.  *Novartis*,

102 F.4th at 461 ("The requirement to 'offer' drugs at a certain 'price' does not prohibit

distribution conditions, much less require the offeror to accede to any distribution terms

demanded by the offeree."); *see also Sanofi*, 58 F.4th at 703.

52.     The 340B statute, in turn, forbids covered entities from "resell[ing] or

otherwise transfer[ring]" a covered outpatient drug "to a person who is not a patient of the

entity," 42 U.S.C. § 256b(a)(5)(B), demonstrating that 340B is intended to be a closed system.

53.    Manufacturers "opt into" 340B (and thereby ensure continued eligibility to participate in Medicare and Medicaid) by signing a uniform federal contract with HHS "for covered drugs purchased by 340B entities." *Astra*, 563 U.S. at 113.  That uniform contract is known as the "Pharmaceutical Pricing Agreement" ("PPA").  *Id.* at 117.  PPAs do not vary between manufacturers, but "simply incorporate statutory obligations and record the manufacturers' agreement to abide by them."  *Id.* at 118.

54.    If HHS determines that a manufacturer breached its 340B obligations, HHS can terminate the PPA and remove the manufacturer from the 340B program.  *See* 42 U.S.C. § 1396r-8(b)(4)(B)(v); 61 Fed. Reg. 65,406, 65,412-13 (Dec. 12, 1996).  And if the manufacturer is removed from the 340B program, its medicines will no longer be eligible to receive reimbursements under Medicaid and Medicare Part B, which would have a profound impact on many vulnerable patient populations.  *See* 42 U.S.C. §§ 1396r-8(a)(1), (a)(5), (b)(4)(B)(v).

55.    Given the stakes for Medicare Part B and Medicaid and their patient populations, Congress chose to assign oversight and enforcement responsibilities exclusively to HHS to ensure the delicate balance that maintains manufacturer participation.  Unlike, say, Medicaid, states do not play any role in administering the 340B program, and neither the 340B statute nor any federal regulation promulgated under it authorizes, envisions, or creates room for state regulation of the 340B program.  Indeed, the Supreme Court made that clear in *Astra*, holding that the administration and

enforcement provisions established an exclusive system of federal management designed to be "harmoniously" administered on a "nationwide basis," with HHS "hold[ing] the control rein." *Astra*, 563 U.S. at 120.

56.     The federal statute does not authorize or even contemplate enforcement by private parties via federal common law or by states. *See* Tr. at 27:14-21, *Astra*, No. 09-1273 (S. Ct. Jan. 19, 2011) (Federal government attorney: "[T]his is essentially a preemption question, but you then have 50 different State regimes, State court regimes, put onto—grafted onto, the Medicaid rebate requirements. This is supposed to be a uniform pricing scheme. And so once the requirements become dis-uniform, it becomes very difficult for HHS to administer the scheme in the way that it's supposed to."); *see also Bauer v. Elrich*, 8 F.4th 291, 306 (4th Cir. 2021) (Quattlebaum, J., dissenting) (stating *Astra* "evoked the legal concepts underlying federal preemption"); *Morrisey*, 760 F. Supp. 3d at 457-58 ("[I]f a [state] attempted to enforce 340B through litigation, *Astra* would directly prevent such a suit as an improper method of 340B enforcement. Why, then, does it matter if the chosen improper enforcement is litigation or legislation? The Court finds that it matters not. Consequently, even though *Astra* was specifically about private suits, its holding still controls here.").

57.     Congress carefully specified the exclusive mechanisms available for administering 340B disputes and violations: audits, administrative dispute resolution ("ADR"), and an enforcement scheme directed by HHS. For instance, the statute specifies that manufacturers have a right to audit covered entities to ensure that the covered entity is

complying with the 340B program's requirements. 42 U.S.C. § 256b(a)(5)(C). Manufacturers, in turn, are also subject to compliance audits. *Id.* § 256b(d)(1)(B)(v).

58.    The imposition of penalties for violating 340B is directly and exclusively committed to HHS:  it evaluates manufacturers' compliance with the 340B statute's requirements and may seek to impose civil monetary penalties of up to $7,000 on manufacturers that purposefully charge covered entities more than the statutory 340B ceiling price for covered outpatient drugs. 42 U.S.C. § 256b(d)(1)(B)(vi) ($5,000, adjusted for inflation).   "Overcharging" refers to charging a covered entity a price above the applicable 340B "ceiling price."

59.    340B also provides for resolving 340B disputes between manufacturers and covered entities via an ADR process to be established through "[r]egulations promulgated by the Secretary [of HHS]."  Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 7102(a), 124 Stat. 119, 826-27 (2010) (codified at 42 U.S.C. § 256b(d)(3)) (amending the statute to require HHS to promulgate regulations establishing ADR).

60.    These regulations must "designate or establish a decision-making official or decision-making body within [HHS] to be responsible for reviewing and finally resolving claims by covered entities that they have been charged prices for covered outpatient drugs in excess of the ceiling price . . . and claims by manufacturers that violations of [statutory prohibitions on unlawful transfers of 340B drugs and duplicate discounts] have occurred." *Id.* (codified at 42 U.S.C. § 256b(d)(3)(B)(i)); *see* 42 C.F.R. § 10.20 (setting out requirements for ADR review panels).

21

61.     HHS regulations also must be designed with such safeguards and "procedures as may be necessary to ensure that claims shall be resolved fairly, efficiently, and expeditiously." 42 U.S.C. § 256b(d)(3)(B)(ii).

62.     To ensure finality and repose, the statute provides that "administrative resolution of a claim or claims . . . shall be a final agency decision and shall be binding upon the parties involved, unless invalidated by an order of a court of competent jurisdiction." *Id.* § 256b(d)(3)(C).

63.     Federal regulations issued in 2024 make clear HHS's view that it has federal statutory authority to address issues regarding manufacturer contract pharmacy policies, including through ADR. *See* 89 Fed. Reg. 28,643, 28,649 (Apr. 19, 2024) (defining overcharge to encompass "a claim that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price or the manufacturer does not offer the 340B ceiling price"). In other words, the federal government believes it has authority to address the precise subject matter H.B. 2048 purports to regulate. *Id.*; 42 U.S.C. § 256b(d)(1) (covering "overcharges and other violations of the discounted pricing requirements").

64.     Covered entities must also comply with requirements under 340B. As explained above, covered entities are prohibited from "resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity." 42 U.S.C. § 256b(a)(5)(B) (prohibiting unlawful transfers). Covered entities are also prohibited from seeking or causing unlawful "duplicate discounts or rebates" from manufacturers. *Id.* § 256b(a)(5)(A). Such "duplicate discounting" most often occurs when a covered entity

obtains a drug at the 340B price and dispenses it to a Medicaid patient, and the manufacturer then also pays a Medicaid rebate to the state Medicaid agency on the same drug.

65.    A covered entity that engages in unlawful transfers or duplicate discounting, which would violate § 256b(a)(5), no longer qualifies as a covered entity under the federal statute.  *Id.* § 256b(a)(4) (specifying that to qualify as a covered entity, the entity must "meet[] the requirements described in paragraph (5)").  Whether a healthcare entity qualifies as a "covered entity" is a decision entrusted to the federal government alone.

66.    In short, the federal statute creates a comprehensive and exclusive federal scheme that (1) specifies the terms of participation in the federal program, (2) sets the federal price at which drugs are sold under the federal program, (3) sets the parameters on when and how manufacturers are required to "offer" their drugs at that price, (4) limits which parties are permitted to purchase drugs at that federal price, (5) imposes specific restrictions on who may benefit from the federal program and limits when drugs at federal prices may be transferred to non-patients, and (6) establishes an exclusive federal mechanism for resolving disputes.

### C.    Contract Pharmacy Abuses

67.    As noted above, 340B requires that a manufacturer offer 340B pricing only to a "covered entity."  42 U.S.C. § 256b(a)(1).

68.    Retail pharmacies are not "covered entit[ies]," so they are ineligible to receive 340B pricing.

69.     But certain private, for-profit entities—including the largest national chain pharmacies—have, in increasing numbers, sought to leverage 340B as a tool to enhance their profitability in a way that Congress never intended.  This is typically accomplished through complicated contractual arrangements between a covered entity, a pharmacy, and other entities like a third-party administrator.

70.     The core feature of these arbitrage arrangements is that the for-profit pharmacies end up obtaining drugs purchased at the 340B price.  These contract pharmacies, however, serve not only patients of 340B covered entities, but the general public as well—despite the fact that 340B-priced drugs are legally permitted to be dispensed only to patients of 340B covered entities.  Inevitably, and at great financial benefit to themselves, contract pharmacies sell drugs purchased at 340B prices to patients who are ineligible to receive such 340B-priced drugs.  *See infra* ¶¶ 73-84.  Contract pharmacies also reap financial benefit when they dispense to 340B-eligible patients: by extracting dispensing fees and a portion of the 340B "spread" (the difference between the 340B price and what payers reimburse them for the drug), for-profit pharmacies divert value Congress intended to go to covered entities and their patients.

71.     Between 2010 and 2018, the number of such contract pharmacy arrangements with covered entities exploded, increasing "more than fifteen-fold, from about 1,300 to approximately 20,000 [as of 2018]."  GAO, GAO-18-480, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 10 (2018) ("2018 GAO Report"), https://tinyurl.com/mr4xbp2m.  A more recent study put the increase between 2010 and 2020 at 4,228%, with now "more than

27,000 individual pharmacies (almost one out of every three pharmacies)" participating in 340B as contract pharmacies. Aaron Vandervelde et al., *For-Profit Pharmacy Participation in the 340B Program* 4, Berkeley Rsch. Grp. (Oct. 2020), https://tinyurl.com/3rk5v8nu. By 2020, each covered entity used an average of 22 contract pharmacies. *Id.* at 7.

72. As of 2023, the estimated number of contract pharmacy arrangements had risen to approximately 33,000. U.S. Sen. Comm. On Health, Educ., Lab. & Pensions, 119th Cong., *Congress Must Act To Bring Needed Reforms To The 340B Drug Pricing Program* 3 ("HELP Report") (Apr. 2025), https://tinyurl.com/yurm3fey. As a result, the number of actual claims for 340B discounts nationwide *tripled* between 2014 and 2019. *See* Adam J. Fein, *New HRSA Data: 340B Program Reached $29.9 billion in 2019; Now Over 8% of Drug Sales*, Drug Channels (June 9, 2020), https://tinyurl.com/5n7bmw5m.

73. Several federal watchdogs, including the GAO and HHS's own Office of Inspector General ("OIG"), have warned that the growth of these arrangements exacerbates concerns about abuse and unlawful claims for 340B-priced drugs. *See* 2018 GAO Report at 44 ("The identified noncompliance at contract pharmacies raises questions about the effectiveness of covered entities' current oversight practices."); *id.* at 45 ("The expansion of contract pharmacies . . . increases potential risks to the 340B Program, such as risks related to diversion and duplicate discounts.").

74.    Here is how the system has evolved over recent years:  Under the product "replenishment model" now in widespread use by contract pharmacies,[4] the pharmacies sell drugs from their general inventories to all individuals (both 340B covered entity patients and non-340B covered entity patients)—at prices significantly above the 340B price.  *See Examining Oversight Reports on the 340B Drug Pricing Program: Hearing Before the S. Comm. On Health, Educ. Labor, & Pensions*, 115th Cong. 11 (2018) (statement of Ann Maxwell, Assistance Inspector Gen. for Evaluation & Inspections, OIG) ("Maxwell Testimony") ("[M]any contract pharmacies dispense drugs to all of their customers—340B-eligible *or otherwise*—from their *regular* inventory." (emphasis added)), https://tinyurl.com/5n8jdr9n.

75.    Then, after subsequent data analysis using undisclosed algorithms, the contract pharmacies purport to retroactively identify individuals with some relationship to a covered entity—purported covered entity "patients" who were not previously identified as covered entity "patients" at the time the drug was dispensed.  *Novartis*, 102 F.4th at 457 (noting that the third-party administrators who run these algorithms "often receive a larger fee for every prescription deemed eligible for the discount").[5]  These black-box algorithms likely result in contract pharmacies claiming prescriptions as 340B-eligible where the individual who was dispensed the drug is not a covered entity "patient."  *See HHS OIG*,

---

[4] A recent U.S. Senate report confirmed: "With the rise of contract pharmacy use in the 340B Program, most covered entities now use the virtual inventory/product replenishment model to dispense 340B drugs."  HELP Report at 31.

[5] *See, e.g.*, 2018 GAO Report at 2; Maxwell Test. at 11.

Mem. Report: Contract Pharmacy Arrangements in the 340B Program, OEI 05-13-00431 16 (Feb. 4, 2014), https://tinyurl.com/yd735xzj.[6]  This process operates in an "after-the-fact" manner inconsistent with the specific program guidance published by HHS.  Although that guidance provides that each prescription be verified as 340B eligible at the time of drug dispensing, no prescriptions are verified in this manner under the product replenishment model.  *See* 61 Fed. Reg. 43,549, 43,556 (Aug. 23, 1996); *see Novartis*, 102 F.4th at 457 ("Only after dispensing the drugs do these pharmacies attempt to discern whether individual customers were patients of covered entities—in other words, whether individual prescriptions were eligible for the discount.").[7]

76.    The pharmacies then purchase additional drugs at the 340B price—nominally in the name of the covered entities—to "replenish" the drugs sold previously to the purported covered entity patients.  Again, this is done after the fact, without the benefit of data verifying that these retroactively reduced prescriptions were actually 340B eligible.

---

[6] HHS OIG has acknowledged this problem.  It discussed the following hypothetical: a physician, who practices part-time at a covered entity hospital, gives a prescription to a patient at his private practice.  *See* Maxwell Test. at 11.  Although this prescription would likely not qualify for 340B, *see* 80 Fed. Reg. 52,300, 52,306 (Aug. 28, 2015), one contract pharmacy said it would claim a 340B price because it simply matches the name of the prescriber with those who work at a 340B covered entity *at all* (even if only part time), *see* Maxwell Test. at 11.  This demonstrates how contract pharmacies can expand the definition of an eligible "patient" to cover additional, non-340B prescriptions.  *See also Novartis*, 102 F.4th at 458 (remarking on this very issue).

[7] This is one reason why purchases of 340B-priced drugs have grown tremendously, while the number of patients treated by covered entities has not.  *See* William Smith & Josh Archambault, *340B Drug Discounts: An Increasingly Dysfunctional Federal Program* 5, Pioneer Health (Mar. 2022), https://tinyurl.com/m2n828a9.

77.    Once those replenishment drugs are received, the cycle starts anew: the 340B-priced drugs are again commingled in the pharmacy's general inventory and dispensed to any individual who walks in the door, regardless of covered entity patient status. Decl. of Krista M. Pedley ¶ 11, *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Human Servs.*, No. 21-cv-00634-PGS-JBD (D.N.J. June 24, 2021), ECF No. 93-2 (U.S. Health Resources and Services Administration Director of Office of Pharmacy Affairs stating that under the product replenishment system, contract pharmacies use stock replenished at 340B prices as "neutral inventory" that "may be dispensed to any subsequent patient").

78.    On information and belief, supported by publicly available information, covered entities *do not* retain title to the drugs throughout the process, and contract pharmacies *do not* act as agents of covered entities and instead serve as independent contractors at most, including in Oklahoma. *See, e.g.*, Walgreens Contract §§ 3.3.5, 8.10, *Sanofi-Aventis U.S. LLC v. HHS*, No. 24-cv-1603 (D.D.C. Nov. 29, 2024), ECF No. 24-2 (showing contract pharmacies take title to the 340B drugs and do not operate as agents of covered entities); Dallas County, 340B Contract Pharmacy Services Agreement – ReCept Pharmacy at 5 (Comm'rs Ct.) ("County shall purchase 340B Drugs through a written contract with the Supplier and shall hold title to such drugs from the time the Supplier fills the order from ReCept [(the contract pharmacy)] made on behalf of the County until the time that ReCept takes delivery of the drugs."), https://tinyurl.com/4wm5d9fd; *see also* Pharmacy Services Agreement Between the County of Monterey and CVS Pharmacy, Inc. at 9, https://tinyurl.com/yr72mhup.

79.     On information and belief, covered entities do not even know beforehand that a contract pharmacy or a third-party administrator is submitting an order for 340B-priced drugs nominally in its name, including in Oklahoma.

80.     As is evident, the product replenishment model encourages commercial pharmacies and covered entities to capture the manufacturer-provided 340B-reduced price, instead of passing on reduced pricing to patients—by replenishing contract pharmacy inventories with 340B-priced drugs.  There is no dispute that the pharmacies could replenish their inventories by ordering the drugs at market prices, but they instead attempt to do so at 340B prices.

81.     On information and belief, the majority of Oklahoma contract pharmacies operate using the product replenishment model.

82.     This product replenishment practice provides a windfall for covered entities and commercial pharmacies.  *See* GAO, GAO-20-108, *340B Drug Discount Program: Increased Oversight Needed to Ensure Nongovernmental Hospitals Meet Eligibility Requirements* 5 (2019) (explaining that covered entities "purchase [340B-priced] drugs at the 340B Program price for all eligible patients regardless of the patients' income or insurance status" and "receiv[e] reimbursement from patients' insurance that may exceed the 340B prices paid for the drugs"), https://tinyurl.com/bxpnc3ry.  As the D.C. Circuit noted, "[t]he covered entity, the pharmacy, and the third-party administrator [who runs the algorithms referenced above] often divvy up the spread between the discounted price and the higher reimbursement rate." *Novartis*, 102 F.4th at 457.  Accordingly, "[e]ach of these actors . . . has a financial incentive to catalog as many prescriptions as possible as eligible

for the discount." *Id.* at 457-58. These windfalls are costs borne entirely by drug manufacturers.

83.     As reflected in a recent report, approximately $1 out of $6 of gross revenue by covered entities nationwide went to contract pharmacies and third-party administrators, who run the black-box algorithms to find allegedly 340B-eligible patients. Minn. Dep't of Health, *340B Covered Entity Report* at 9 (Nov. 25, 2024), https://tinyurl.com/ysrsex84; *see also* S. Comm. on Health, Educ., Lab., & Pensions, Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program 26-27 (Apr. 2025) (reflecting CVS's third-party administrator, Wellpartner, generated $1.6 billion in revenue from covered entities from 2019 to 2023 through third-party administrator fees), https://tinyurl.com/3rh429c9.

84.     Both CVS and Walgreens, two of the largest for-profit pharmacy retailers, have publicly disclosed that 340B profits are material to their finances, and that a reduction in contract pharmacy arrangements "could materially and adversely affect" their finances. CVS, SEC Form 10-K at 23 (2024), https://tinyurl.com/4pbtt9x8; Walgreens, SEC Form 10-K at 30 (2024), https://tinyurl.com/zp9vv465.

85.     By contrast, patients routinely do not receive the benefit of the discount in the form of lower prescription costs. *See* Summ. J. Hr'g Tr. at 60:2-7, *PhRMA v. Murrill*, No. 6:23-cv-00997, ECF No. 78 (June 7, 2024) (Counsel for covered entity Intervenors: "Under replenishment, . . . the pharmacy is not going to know that that's a 340B eligible patient. That's not in the record the pharmacy has available."); Rory Martin & Kepler Illich, *Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?* 3, 12, IQVIA (2022) (concluding that "most 340B-eligible patients

at contract pharmacies are not directly benefiting from 340B discounts" and that stakeholders in the 340B program, such as contract pharmacies, are "profit[ing] from 340B revenue"), https://tinyurl.com/mvuy8276; Rory Martin, et al., *Do Patients Receive 340B Drug Discounts at the Contract Pharmacy Counter?* 9, IQVIA (2025), https://tinyurl.com/596x2ws7; Rory Martin & Harish Karne, *The 340B Drug Discount Program Grew to $124B in 2023* 6, IQVIA (2024) ("If a substantial number of states pass [policies prohibiting the use of contract pharmacy restrictions], it could further accelerate 340B growth in the coming years" and "reignite the problem of duplicate discounts, since it is difficult to determine the 340B status of prescriptions that are filled at contract pharmacies."), https://tinyurl.com/y9aeb727.

86.    Recent evidence continues to reinforce these conclusions.  For example, media reporting has revealed how in many cases 340B price reductions are not passed on to vulnerable populations in the form of lower prices.  *See* Anna Wilde Matthews et al., *Many Hospitals Get Big Drug Discounts. That Doesn't Mean Markdowns for Patients*, WALL ST. J. (Dec. 20, 2022) (explaining that many hospitals do not pass on 340B discounts to their patients and that 340B appears to bolster profits in well-off areas more than helping hospitals in less-privileged neighborhoods), https://tinyurl.com/bdhhzdhr; Katie Thomas & Jessica Silver-Greenberg, *How a Hospital Chain Used a Poor Neighborhood to Turn Huge Profits*, N.Y. TIMES (Sept. 24, 2022) (explaining how one hospital "nakedly capitaliz[ed] on" 340B to turn a profit), https://tinyurl.com/28ubr4hd; Joseph Walker, *Employers Get Big Drug Discounts Through Program for Hospitals That Serve Poor Patients*, WALL ST. J. (Mar. 15, 2025) (explaining how sophisticated middlemen help

employers tap 340B to save money on prescription drug programs, a far cry from the program's original focus on aiding low-income patients), https://tinyurl.com/y34ctaf5.

87.    Similarly, a recent GAO report surveying hospitals found that, of the 30 hospitals surveyed that reported use of contract pharmacies, almost half (14) indicated that they do not provide *any* discounts at contract pharmacies, 10 reported they provide discounts at some contract pharmacies, and only six provided discounts at all contract pharmacies.  GAO, GAO-23-106095, *340B Drug Discount Program: Increased Oversight Needed to Ensure Nongovernmental Hospitals Meet Eligibility Requirements* 16 (2019), https://tinyurl.com/49jzmnne.  Even among those that do provide discounts, most (10) reported that it varied by pharmacy or patient circumstances, three reported using the patient's co-pay as the "discount," two reported that they charged more than the 340B price the hospital paid, and only one reported charging less than the 340B price.  *Id.* at 17.

88.    In Oklahoma, many contract pharmacies are not even located in low-income districts.  A 2025 report from the Pioneer Institute found 47% of 340B pharmacies in the state, supposedly serving the poor, are located in affluent neighborhoods.  Pioneer Inst., *340B in Oklahoma* (2025), https://tinyurl.com/acfc8uky.

89.    Other state level reports similarly demonstrate that covered entities and their contract pharmacies provide little financial benefit to vulnerable populations.  A 2024 report from North Carolina's treasurer focusing on North Carolina's State Health Plan and purchased oncology drugs found that 340B hospitals applied an average markup of 5.4 times their discounted acquisition costs compared to the 2.9 times markup applied by non-340B hospitals.  N.C. Treasurer, *Overcharged: State Employees, Cancer Drugs, and the*

*340B Drug Pricing Program* 14-15 (2024), https://tinyurl.com/26cxtzw4.   And while North Carolina's 340B hospitals reported an average 15.5% net profit margin compared to the 9.4% profit margin for non-340B hospitals, some of the hospitals reporting the lowest levels of charity care were 340B hospitals.  15.6% of 340B hospitals spent *less than 1%* on charity care.  *Id.* at 19-20.

90.    The unlawful and unauthorized expansion of the federally-mandated, privately-funded 340B subsidy has other repercussions as well.  Expanding the subsidy has led to increased consolidation in the healthcare system, with large hospital beneficiaries snapping up smaller physician providers with "no evidence of hospitals using the surplus . . . to invest in safety-net providers, provide more inpatient care to low-income patients, or enhance care for low-income groups in ways that would reduce mortality."  Sunita Desai, Ph.D. & J. Michael McWilliams, M.D., Ph.D., *Consequences of the 340B Drug Pricing Program*, 378 NEW ENG. J. MED., 539, 546 (2018), https://tinyurl.com/nhhtyyah.

91.    Besides taking 340B price reductions intended for vulnerable populations, the explosion in contract pharmacy arrangements has also led to an increase in unlawful transfers of drugs purchased at a 340B price.  *See, e.g.*, 42 U.S.C. § 256b(a)(5)(B) (prohibiting transfer or sale to anyone "who is not a patient of the [covered] entity"); GAO, GAO-11-836, *Drug Pricing, Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 28 (2011) ("Operating the 340B program in contract pharmacies creates more opportunities for drug diversion compared to in-house pharmacies."), https://tinyurl.com/yc2mhbeu.    Indeed, approximately two-thirds of

violations for unlawful transfers uncovered by HHS audits "involved drugs distributed at contract pharmacies." 2018 GAO Report at 44.

92.     The use of contract pharmacies can also exacerbate unlawful "duplicate discounting." 42 U.S.C. § 256b(a)(5)(A). Unlawful duplicate discounting forces the manufacturer to provide a discount on its drug twice-over—once under 340B to the covered entity, and again in the form of a rebate to the state Medicaid agency.

93.     GAO has found that duplicate discounting happens with outsized frequency when covered entities use contract pharmacies. *See, e.g.*, 2018 GAO Report at 45; *see generally* GAO, GAO-20-212, *340B Drug Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement* (2020), https://tinyurl.com/mr38ccjr. As the GAO explains, this is because of the difficulty of auditing and obtaining reliable data for covered entities with "complex" networks of contract pharmacies. 2018 GAO Report at 45.

### D.     Covered Entities' Repeated Efforts To Expand 340B

94.     Induced by the extraordinary profits to be made at manufacturers' expense, covered entities have repeatedly attempted to circumvent federal authority over 340B to impose their own preferred obligations on 340B manufacturers.

95.     In 2006, covered entities filed suit against several pharmaceutical manufacturers, claiming that they had been overcharged for 340B-priced drugs in violation of the PPAs between manufacturers and the federal government. *Astra*, 563 U.S. at 116-17. The Supreme Court subsequently unanimously rejected such private actions as an alternative 340B enforcement mechanism, concluding that Congress designed the 340B

program to be uniformly administered by the federal government. *Id.* at 120. As the Supreme Court held, "Congress vested authority to oversee compliance with the 340B Program in HHS and assigned no auxiliary enforcement role to covered entities." *Id.* at 117. Rather than allowing "340B entities to launch lawsuits in district courts across the country," with the attendant "risk of conflicting adjudications," "Congress directed [HHS] to create a formal dispute resolution procedure, institute refund and civil penalty systems, and perform audits of manufacturers." *Id.* at 120-21. "Congress thus opted to strengthen and formalize [HHS]'s enforcement authority, to make the new adjudicative framework *the proper remedy*[.]" *Id.* at 121-22 (emphasis added).

96.    Approximately ten years later, with the continued explosion in contract pharmacy arrangements, the increased use of the product replenishment model, and documented problems with program integrity, certain PhRMA members independently adopted new and different policies to address the 340B abuses reported by federal watchdogs. *See, e.g.*, First Am. Compl. ¶¶ 48-52, *AstraZeneca Pharms. LP v. Becerra*, No. 1:21-cv-00027 (D. Del. Feb. 12, 2021), ECF No. 13.

97.    In particular, manufacturers individually decided to revise the terms of their 340B offers to include conditions related to the use of contract pharmacies by covered entities for 340B-priced drugs. These conditions include limits on the number of contract pharmacies, for each covered entity, and requirements to supply data about claims for

340B-priced drugs.[8]  Through these revisions to their offers, PhRMA members informed covered entities that they would not sell drugs to covered entities at 340B prices unless covered entities agreed to those contract pharmacy policy conditions.

98.    The conditions of these policies are configured into the programming logic of the distributor's platform that covered entities and their contract pharmacies use to purchase the manufacturer's drugs through the 340B program.

99.    If a covered entity accedes to the terms of the manufacturer's contract pharmacy policy conditions, and designates a contract pharmacy consistent with the terms of that policy, the manufacturer includes the designated contract pharmacy on the list of eligible contract pharmacies that it provides to distributors of its drugs.

100.    Those distributors then configure their systems to allow contract pharmacies on the manufacturer's list to access 340B pricing and block those not on the manufacturer's list from purchasing the drug at the 340B price.

101.    If a covered entity does not accept the conditions of the contract pharmacy policy, then neither it nor any contract pharmacy purporting to act on its behalf can purchase drugs from that manufacturer through the 340B program for the contract pharmacy to dispense to the covered entity's patients.  Similarly, if a covered entity refuses to agree to a manufacturer's claims data condition for contract pharmacies, then the covered entity and its contract pharmacies cannot purchase drugs from that manufacturer

---

[8] Many of PhRMA's members have policies regarding the use of contract pharmacies and claims data requirements.  *See* https://tinyurl.com/y84hrcac.

through the 340B program for the contract pharmacy to dispense to the covered entity's patients.

102.    A covered entity that does not accept a manufacturer's conditions, and any contract pharmacies affiliated with it, can still purchase drugs from the manufacturer for the contract pharmacy to dispense to the covered entity's patients, so long as the pharmacies qualify under relevant laws and requirements to receive the drugs.  They just cannot purchase those drugs at the steeply reduced 340B price.

103.    In response to manufacturers' policies, the General Counsel of HHS issued a legal opinion on December 30, 2020, opining that "*to the extent* contract pharmacies are acting as *agents* of a covered entity, a drug manufacturer in the 340B Program is obligated to deliver its covered outpatient drugs to those contract pharmacies and to charge the covered entity no more than the 340B ceiling price for those drugs."  *AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 52-53 (D. Del. 2021).  Although the Advisory Opinion was subsequently vacated on other grounds, it demonstrated HHS's understanding that, at a minimum, an agency relationship is required between a covered entity and its contract pharmacy, echoing prior HHS guidance.  61 Fed. Reg. at 43,550, 43,555 (HHS 1996 guidance stating that a covered entity without an in-house pharmacy could contract with *one* contract pharmacy to serve as its "agent").

104.    In May 2021, HHS issued letter decisions to the manufacturers that were implementing policies to address 340B abuses, including PhRMA members.[9]    Litigation ensued.

105.    In the context of those suits, courts have repeatedly concluded that the 340B program does not require manufacturers to sell 340B-priced drugs to an unlimited number of contract pharmacies of covered entities—the requirement Oklahoma seeks to impose here.

106.    The D.C. Circuit in *Novartis* and the Third Circuit in *Sanofi*, considering two of these lawsuits, began their recent analyses by explaining how the federal statute works and how contract pharmacy and claims data policies interact with it.[10]

107.    In *Novartis*, one manufacturer was "willing to work with at least one contract pharmacy designated or previously used by the [covered] entity," so long as the "contract

---

[9] *See* HHS, 340B Drug Pricing Program, *HRSA Determines Six Pharmaceutical Manufacturers Are in Violation of the 340B Statute*, Health Res. & Servs. Admin., HRSA Letter to AstraZeneca Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/2nybf4z2; HRSA Letter to Lilly USA, LLC Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/5xkem3y7; HRSA Letter to Novartis Pharmaceuticals Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/jytw6xd6; HRSA Letter to Novo Nordisk Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/ycxwceaz; HRSA Letter to Sanofi Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/2veh5838; HRSA Letter to United Therapeutics Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/2p85wz8d.

[10] One appeal remains pending.  *See Eli Lilly & Co. v. Becerra*, Nos. 21-3128, 21-3405 (7th Cir.).

pharmacies provide claims data for contract-pharmacy orders." 102 F.4th at 463. The other manufacturer "intend[ed] to deliver section 340B drugs to a covered entity's in-house pharmacy or to a single contract pharmacy designated by the covered entity." *Id.* at 463-64. In *Sanofi*, two manufacturers had policies permitting each covered entity to use "one contract pharmacy" if the covered entity "d[id] not have an in-house pharmacy." 58 F.4th at 701. A third manufacturer similarly permitted each covered entity to use "one contract pharmacy" if the covered entity "d[id] not have an in-house pharmacy," but also permitted the covered entity to use "an unlimited number of contract pharmacies" so long as it "agree[d] to provide claims data." *Id.*

108.    340B requires that manufacturers "'offer each covered entity covered outpatient drugs for purchase' at or below a specified ceiling 'price." *Novartis*, 102 F.4th at 460 (quoting 42 U.S.C. § 256b(a)(1)). The covered entity who receives such an "offer" can either accept the terms of the offer and "purchase" the covered outpatient drugs, or it can decide to not "assent to the same terms," in which case it rejects the 340B offer and therefore cannot purchase the drugs at 340B prices. *Id.* (quoting 1 *Corbin on Contracts* § 1.11 (2023)); *see also Sanofi*, 58 F.4th at 703 (holding that manufacturers are required to only "present the drugs [with conditions permitted] for covered entities' acceptance"). That congressional mandate thus does not "require the offeror to accede to any distribution terms demanded by the offeree." *Novartis*, 102 F.4th at 461; *Sanofi*, 58 F.4th at 703 (holding that the word "offer" does not "imply that the offeror must deliver goods wherever and to whomever the buyer demands"). If a covered entity rejects the offer, the

manufacturer has no obligation to sell the drugs to that covered entity at the 340B price. *See Novartis*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 703-04.

109.    The D.C. Circuit rejected HHS's argument that 340B requires manufacturers to sell drugs at 340B prices for dispensing by an unlimited number of contract pharmacies designated by covered entities. *Novartis*, 102 F.4th at 460.  As the D.C. Circuit concluded, Congress chose to impose only certain restrictions on 340B-participating manufacturers— most notably that they make a "bona fide" offer to sell 340B-priced drugs to covered entities, *i.e.*, that they "propose to sell covered drugs to covered entities at or below a specified monetary amount." *Id.*  And Congress did not bar manufacturers from imposing "conditions on the distribution of covered drugs to covered entities." *Id.* at 459-60.

110.    The D.C. Circuit therefore rejected the notion that HHS could compel manufacturers to sell their drugs at 340B prices to covered entities that insist on using an unlimited number of contract pharmacies.  As that court explained, Congress's "silen[ce] about delivery conditions . . . preserves—rather than abrogates—the ability of sellers to impose at least some delivery conditions." *Id.* at 460-61.  The court noted that this "silence" did not mean that manufacturers have carte blanche as to conditions. *Id.* at 462-63.  But it does permit them to impose conditions on their 340B offers so long as those conditions would not move their offers out of the realm of "bona fide" offers. *Id.*

111.    The Third Circuit's decision in *Sanofi* likewise rejected the very same obligation Oklahoma seeks to impose here.  58 F.4th at 703-04.  The Third Circuit noted that "Congress's use of the singular 'covered entity' in the [statute's] 'purchased by' language suggests that it had in mind one-to-one transactions between a covered entity and

a drug maker *without mixing in a plethora of pharmacies*." *Id.* (emphasis added); *id.* at

704 (340B does not "require[] delivery to an unlimited number of contract pharmacies").

The Third Circuit also expressly enjoined the federal government from imposing this

requirement. *Id.* at 706 (barring the federal government "from enforcing against [plaintiffs]

its reading of Section 340B as requiring delivery of discounted drugs to an unlimited

number of contract pharmacies"); *id.* at 704 (noting that "'Congress knew how to' grant

covered entities permission to contract with third parties for distribution . . . but did not"

(quoting *State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 580 U.S. 36, 39

(2016))).

112.    In doing so, the Third Circuit concluded that, despite the statute's "silence"

as to the number of contract pharmacies a covered entity could use, forcing manufacturers

to accede to covered entities' demands to use an unlimited number of contract pharmacies

"overstepped the statute's bounds," as reflected in 340B's structure and other

considerations. *Sanofi*, 58 F.4th at 707. The Third Circuit left open the possibility,

however, that the federal obligation could require that manufacturers offer to deliver 340B-

priced drugs to contract pharmacies in certain circumstances (for example, to a single

contract pharmacy if a covered entity lacks its own in-house pharmacy). 42 U.S.C.

§ 256b(a)(1); *Sanofi*, 58 F.4th at 703-04. But the court concluded that Congress did not

empower HHS to force manufacturers to deliver 340B-priced drugs to any and all contract

pharmacies of a covered entity's choosing. *Sanofi*, 58 F.4th at 705.

113.    Both *Novartis* and *Sanofi* make clear that the federal statute *does* regulate

distribution to contract pharmacies:  Congress's decided that, while manufacturers may not

be able to bar the use of one contract pharmacy for a covered entity that lacks an in-house pharmacy, *Sanofi*, 58 F.4th at 703-04, they can condition the sale of 340B-priced drugs on a covered entity's agreement to comply with limitations on contract pharmacy use and providing claims data, *id.* at 706; *Novartis*, 102 F.4th at 460 ("Statutory silence implies that manufacturers *may* impose distribution conditions by contract[.]").    These cases accordingly indicate that the issue of delivery to a contract pharmacy is governed by federal law:  Because Congress did not give HHS the power to mandate delivery to contract pharmacies beyond that necessary to ensure a 340B offer remains bona fide given Congress's limitations for the program, it left manufacturers free to impose such conditions.  *See also* 42 U.S.C. § 256b(d)(2)(B)(iv) (providing for establishment of database "by which each covered entity site," which does not include pharmacies, "can be identified by manufacturers . . . for purposes of facilitating the ordering, purchasing, and delivery of" 340B-priced drugs).

114.    Two other courts are in accord.  The U.S. District Court for the District of Columbia likewise determined in *Novartis Pharms. Corp. v. Espinosa*, No. 21-cv-1479, 2021 WL 5161783 (D.D.C. Nov. 5, 2021), and the court of appeals affirmed, *Novartis*, 102 F.4th at 455, that the 340B statute permits drug manufacturers to impose reasonable conditions regarding covered entities' use of contract pharmacies as part of their 340B offers, including a reasonable limitation on where manufacturers will send 340B-priced drugs.  *Novartis*, 2021 WL 5161783, at *7.  In a similar vein, the U.S. District Court for the District of Delaware concluded in *AstraZeneca* that Congress chose not to require

manufacturers to provide 340B-priced drugs to an unlimited number of contract pharmacies that a covered entity insists on using.  543 F. Supp. 3d at 58-59.

115.    The same is true of manufacturers' conditions on their offers of 340B-priced drugs that require covered entities and contract pharmacies to provide certain claims data related to the prescriptions that were purportedly dispensed as 340B drugs.  Courts have concluded that manufacturers may impose such conditions (including to help access statutory audit protections), and that those conditions on a 340B offer satisfy the federal obligation.  *See Novartis*, 2021 WL 5161783, at *8 (holding that, under federal law, manufacturers are permitted to require certain types of data as a precondition of their "offer" of 340B-priced drugs); *id.* ("For its part, [plaintiff manufacturer] convincingly argues that the claims data conditions that it has added to its new 340B policy will enable it to better utilize the anti-fraud audit and ADR procedures that Congress established for manufacturers in Section 340B."); *Novartis*, 102 F.4th at 463 (affirming holding).

116.    For their part, covered entities have sought to use the federal ADR mechanism, which is overseen by a panel within HHS, to force manufacturers to provide 340B-priced drugs to any and all contract pharmacies identified by a covered entity.  In those proceedings, a group of covered entities alleged that a drug manufacturer "ha[d] violated the 340B statute and regulations by failing to offer covered outpatient drugs at the 340B ceiling price through Petitioner's contract pharmacy arrangements."  Those entities asked the panel "to order [the manufacturer] to resume offering covered outpatient drugs at the 340B ceiling price to Petitioner through its contract pharmacies; and to order [the manufacturer] to pay Petitioner an amount equal to the 340B discounts that [the

manufacturer] has failed to provide."  Pet. for Damages and Equitable Relief ¶ 1, *Open Door Cmty. Health Ctrs. v. AstraZeneca Pharms., LP*, ADR ID: 210112-1 (HHS ADR Bd. Jan. 13, 2021), https://tinyurl.com/2twhwhtc; *see also* Pet. for Monetary Damages and Equitable Relief ¶¶ 35-37, *Univ. of Wash. Med. Ctr. v. AstraZeneca Pharms. LP* (HHS Bd. Sept. 29, 2023) (petition by a different group of covered entities asserting panel has jurisdiction over contract pharmacy disputes).

117.    Recently, an ADR Panel within HHS adjudicated an ADR petition premised on an alleged 340B overcharge violation and held that manufacturer contract pharmacy policies *do not* constitute a violation of 340B.  *See* HHS ADR Panel, *St. Croix Reg'l Med. Ctr.* Decision Summary (2025), https://tinyurl.com/3pvw43zd.

118.    Against the backdrop of unfavorable federal outcomes, covered entities turned their sights to lobbying states to seek the very same benefits they are not owed under federal law.  They seek to change the federal program by mandating that manufacturers take actions that even HHS, which is tasked with 340B's administration and enforcement, cannot require.

119.    The repercussions of those efforts, if allowed to stand, will be intensified by the recently enacted IRA.[11]  The IRA establishes the Medicare Drug Price Negotiation Program, under which HHS is to "negotiate" with manufacturers "maximum fair prices" for certain drugs. 42 U.S.C. § 1320f-3(a).  Manufacturers must provide access to selected

---

[11] Several of PhRMA's members have drugs that are subject to the IRA's Medicare Drug Price Negotiation Program, including Boehringer Ingelheim Pharmaceuticals, Inc., Bristol Myers Squibb, Astellas Pharma, Novo Nordisk Inc., and Merck & Co., Inc.

drugs at the so-called maximum fair prices, except that they need not provide access to the maximum fair prices when such selected drugs are 340B-eligible and the 340B price is lower than the maximum fair price.  *Id.* § 1320f-2(d).  That is, manufacturers need not provide both the 340B price and "maximum fair price" on the same selected drug.  *Id.*  To avoid duplicate discounting, this scheme necessarily requires identifying when a drug subject to the maximum fair price is dispensed as a 340B drug—further demonstrating the "interdependent nature" of Medicare and the 340B program.  *Astra*, 563 U.S. at 120.

120.    The Centers for Medicare and Medicaid Services ("CMS") has issued final IRA guidance for avoiding duplicate discounting under the Medicare Drug Price Negotiation Program.    Under that guidance, a manufacturer bears the burden of determining and verifying whether a "claim for a selected drug is a 340B-eligible claim." CMS, Medicare Drug Pricing Negotiation Final Guidance ("Final Guidance") at 60, https://tinyurl.com/3sx8hmah; *see also* CMS, Medicare Drug Price Negotiation Program Draft Guidance ("Draft Guidance"), at 48 (A manufacturer must "indicate[] that the claim for [a] selected drug is a 340B-eligible claim and the 340B ceiling price is lower than the [maximum fair price] for the selected drug."), https://tinyurl.com/dapyyjyf.  To facilitate the identification of 340B drugs, dispensing entities are encouraged to use claims codes indicating which drugs are dispensed under the 340B program, and to provide prescriber identification information to help manufacturers identify "whether a prescription was written by a prescriber with a high percentage of claims originating from a 340B covered entity."  Draft Guidance at 41; Final Guidance at 45, 57.  Commenters noted "that, under the nonduplication approach described by CMS in the draft guidance, [IRA] Manufacturers

would likely mandate 340B claims data submission from covered entities." Final Guidance at 57. "Many commenters strongly opposed CMS allowing for such mandates and stated that, at minimum, CMS should evaluate and regulate the data requirements imposed by [IRA] Manufacturers on covered entities." *Id.* In response to such comments, CMS stated it "will not prescribe a specific nonduplication approach that [IRA] Manufacturers must follow or impose parameters" on it, and noted in its justification that manufacturers bear the burden for ensuring nonduplication. *Id.* at 57-58; *id.* at 54 (stating CMS "will not assume responsibility for deduplicating discounts between the 340B ceiling price and the [maximum fair price]").

121.    On August 1, 2025, HHS issued guidance discussing one mechanism for qualifying drug manufacturers to provide the 340B ceiling price: so-called "rebate models," which involve collecting claims data and then providing the 340B price through rebates, rather than as upfront discounts, to allow compliance with the IRA. *See* HHS, Announcement of Application Process for the 340B Rebate Model Pilot Program & Request for Public Comment, 90 Fed. Reg. 36,163 (Aug. 1, 2025). As the notice explains, manufacturers seek to use rebate models, including claims data collection as part of the models, to detect and prevent duplicate discounts (including duplicate discounts under the IRA) and diversion. *Id.*

122.    The announcement explains HHS's view that it has authority over and regulates terms of 340B participation, including the ability to use such rebate models. *Id.* at 36,163-65. As part of that process, HHS is setting up a Rebate Model Pilot Program for certain manufacturers (including some of PhRMA's members) to offer the 340B price via

rebates, rather than via upfront discounts. *Id.* In addition to expressly recognizing the use of rebates for qualifying manufacturers, the announcement also makes clear that participating manufacturers can demand certain claims data as part of their rebate models to guard against duplicate discounting. *Id.* at 36,164-65.

123.    Several of PhRMA's members, including Bristol Myers Squibb, Merck Sharp Dohme, Boehringer Ingelheim, and Novo Nordisk, are now approved to participate in the Rebate Model Pilot Program for their drugs subject to the IRA. HHS, 340B Rebate Model Pilot Program, https://tinyurl.com/mrx4ur35 ("Rebate Model Pilot Program Information"). As part of that Program, covered entities will purchase those drugs at what is known as the wholesale acquisition cost (typically the manufacturer's list price for the drug, excluding any rebates or discounts). Covered entities will then submit claims data to the manufacturer if they wish to seek payment of a 340B rebate, which will lower the net cost of the product to at least the 340B ceiling price. *See* Beacon Support Center, Rebate Model Frequently Asked Questions, https://tinyurl.com/mrxbvhzd. To effectuate the rebate, manufacturers may require the following pharmacy claims data fields: date of service, date of prescribing, Rx number, fill number, national drug code, quantity dispensed, prescriber and service provider ID, and 340B ID, among other things. *See* Rebate Model Pilot Program Information. Manufacturers may also require medical claims data fields, including date of service, claim line number, claim number, unit of measure, national drug code, quantity, rendering physician ID, service provider ID, 340B ID, health plan name, health plan ID, and other information. *Id.*

124.    HHS's Rebate Model Pilot Program (and its guidance announcing that Program) further underscore that the mechanics of the 340B program—like claims data collection as part of manufacturers' 340B offers and the use of rebates to provide the 340B ceiling price—are exclusively questions of federal law, with interlinked effects on 340B, Medicare (including the new IRA requirements), and Medicaid, that require delicate balancing and analysis of their effects across these other federal programs.  *Id.* at 36,164 (noting that implementation of mechanism requires "methodical and thoughtful approach" and seeking comment on various effects).

**E.    Oklahoma Enacts H.B. 2048 To Impose State-Law Conditions On 340B**

> 1.    H.B. 2048's Passage And Requirements

125.    H.B. 2048 is due to become effective on November 1, 2025.  H.B. 2048 § 10.

126.    H.B. 2048 is targeted at and has the purpose and effect of regulating a federal program.  Indeed, H.B. 2048 is clear that its regulatory object is the federal 340B program and without that federal program, H.B. 2048 would have no independent effect.  *See, e.g.*, H.B. 2048 § 2(1) (defining "340B drug" to mean "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to Section 256b of Title 42 of the United States Code and is purchased by a covered entity as defined in Section 256b(a)(4) of Title 42 of the United States Code").  In short, the whole and sole point of H.B. 2048 is to impose special obligations on participants in a federal Spending Power program.

127.    H.B. 2048's prohibition is explicitly directed at manufacturers who participate in the federal 340B program, as a condition of their eligibility to receive federal funds via Medicare and Medicaid.  It instructs that "[a] manufacturer shall not deny,

restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity, unless such receipt is prohibited by the United States Department of Health and Human Services." *Id.* § 4(A).

128.    H.B. 2048 expansively defines a "340B entity" to include "an entity participating or authorized to participate in the federal 340B drug discount program, as described in Section 256b of Title 42 of the United States Code, *including its pharmacy, or any pharmacy contracted with the participating entity* to dispense drugs purchased through the 340B drug discount program." *Id.* § 2(2) (emphasis added).

2.    Enforcement

129.    H.B. 2048 does not acknowledge the limitations on enforcement power that Congress deemed necessary to maintain the 340B program's delicate balance.

130.    Instead, H.B. 2048 subjects manufacturers to civil liability and severe penalties.  For a suit brought by the Oklahoma Attorney General, the civil remedies include a civil penalty of up to $10,000 for each violation, with "[e]ach time a prohibited act is committed" constituting a separate violation.  H.B. 2048 § 5.

131.    H.B. 2048 also subjects manufacturers to potential *criminal* liability.  The relevant provisions of H.B. 2048 are to be codified in Title 36 of the Oklahoma's Statutes.  H.B. 2048 §§ 1-6.  This Title, called the "Oklahoma Insurance Code," *see* Okla. Stat. tit. 36, § 101, provides that the "violation of any provision of this Code shall constitute a misdemeanor and shall be punishable as such where no greater penalty is provided therefor."  Okla. Stat. tit. 36, § 117.

132.    These procedures and remedies extend far beyond the procedures and remedies the federal government may pursue under 340B.  *See, e.g.*, 42 U.S.C. § 256b(d).

133.    H.B. 2048 expressly predicates its purported addition of a state law obligation on the existence of an underlying federal obligation.

134.    As a result, in any state enforcement proceeding, a state adjudicator will be required to answer multiple questions of federal law to determine if a manufacturer violated H.B. 2048.  *See infra* ¶ 177-78 (cataloging the numerous questions of federal law that would need to be decided).

## CLAIMS FOR RELIEF

### CLAIM I
### (Declaratory/Injunctive Relief—Preemption Under the Supremacy Clause of the U.S. Constitution and the Federal 340B Statute)

135.    PhRMA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

136.    Federal law is "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

137.    Preemption principles have particular force for statutes like 340B that are enacted pursuant to Congress's Spending Power.  *See supra* ¶¶ 2-12 (discussing that conditions of receipt of federal funds must be "unambiguous" and recipients must have "clear notice").

138.    The Supreme Court has long and consistently rejected state efforts to regulate a program or relationship that "originates from, is governed by, and terminates according

to federal law." *Buckman*, 531 U.S. at 347; *see also, e.g.*, *Boyle*, 487 U.S. at 504-13 (holding that state tort law cannot be used to hold federal contractors liable for design defects in military equipment).

139.    340B is created entirely by federal statute, *see* Pub. L. No. 102-585, § 602, 106 Stat. 4,943, 4,967 (1992); Pub. L. No. 111-148, tit. VII.B, §§ 7101-02, 124 Stat. 119, 821-27 (2010) (both codified at 42 U.S.C. § 256b); it is governed only by federal law and administered exclusively by HHS, *see Astra*, 563 U.S. 119-20; and federal law exclusively dictates who must participate in the program and when, *see* 42 U.S.C. § 1396r-8(a)(1); *id.* § 256b(a)(1).

140.    States do not traditionally have the power to directly regulate a federal program or relationship itself.  *See, e.g.*, *Buckman*, 531 U.S. at 348 (holding state-law claims for fraud on a federal agency preempted).  For that reason alone, "no presumption against pre-emption obtains in this" context.  *Id.* at 347.  To the contrary, states presumptively *do not* have the power to single out federal programs for special regulation unless Congress has expressly authorized them to do so.

141.    That is because, when a state has directly targeted a federal program, the uniquely federal interest in "obligations to and rights of the United States" "changes what would otherwise be a conflict that cannot produce pre-emption into one that can."  *Boyle*, 487 U.S. at 508.

142.    This time-tested approach to evaluating state laws that directly target federal programs, particularly those enacted pursuant to the Spending Power, makes sense, given that states lack authority in our constitutional system to single out for special regulation

"the United States or those with whom it deals." *South Carolina*, 485 U.S. at 523. Consistent with that principle, the Supreme Court has held time and again that states may not "control" federal operations by regulating those that contract with the federal government to advance federal objectives. *See Osborn*, 22 U.S. (9 Wheat.) at 786-89, 866-67; *Crandall*, 73 U.S. (6 Wall.) at 44-45; *Okla. Tax Comm'n*, 336 U.S. at 364. Such discrimination occurs when a state law "singles" out those who contract with the federal government "for less favorable treatment" or "regulates them unfavorably on some basis related to their governmental status." *United States v. Washington*, 596 U.S. 832, 838-40 (2022) (citations and quotation marks omitted).

143.    Yet that is exactly what Oklahoma does here. H.B. 2048 "singles" out "Federal Government . . . contractors" for more burdensome regulation compared to manufacturers that do not participate in 340B, who remain free to refuse to sell their drugs to *anyone* at 340B prices, and certainly can insist on the same delivery conditions and claims data requirements that Oklahoma now prevents manufacturers from imposing when they agree to sell their drugs at 340B prices. *Id.* at 839. Under established principles of intergovernmental immunity, a state cannot directly regulate the activities of the federal government, nor impose obligations specific to those who contract with the federal government, unless Congress has "clearly and unambiguously authorized it." *E.g.*, *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 321 (3d Cir. 2025) (quoting *Washington*, 596 U.S. at 840). And, here, no one could seriously argue that Congress has "clearly and unambiguously authorized" states to play any role in regulating or even administering participation in the 340B program.

144.    Those bedrock principles suffice to resolve this case.  With H.B. 2048, Oklahoma seeks to barge into the federal 340B program and federal 340B contract, impose significant new obligations on drug manufacturers that change the federal bargain, and impose substantial additional burdens on HHS to boot.

145.    H.B. 2048 is also preempted under the principles that apply with respect to all federal legislation, because it intrudes upon the exclusive field created by 340B and, worse, does so in a way that directly conflicts with the federal statute's terms and in a manner that is likely to generate conflict between state and federal regulators.

146.    Field preemption exists where (1) Congress's "framework of regulation [is] 'so pervasive'" that Congress has "left no room for the States to supplement it," or (2) where there is a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."  *Arizona v. United States*, 567 U.S. 387 399 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1325 (10th Cir. 2010).

147.    Field preemption is especially likely where a state law "'diminish[es] the [Federal Government]'s control over enforcement' and 'detract[s] from the integrated scheme of regulation' created by Congress."  *Arizona*, 567 U.S. at 402 (quoting *Wis. Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 288-89 (1986)).

148.    As the Supreme Court has recognized, Congress created a comprehensive federal program in 340B and centralized control of that program exclusively within HHS to safeguard the delicate balance Congress struck.  *See Astra*, 563 U.S. at 120 (noting the "interdependent" nature of 340B with other federal programs).  No room exists for state

supplantation in this field. Congress created the exclusively federal field here through enactment of 340B. *See supra* ¶¶ 2-26. Unlike some other federal healthcare programs, where Congress has assigned the states significant roles in administering those programs, it chose not to do so here. *See, e.g.*, 42 U.S.C. § 1396a (Medicaid statute providing for state plans); *id.* § 18031 (Affordable Care Act establishing states' ability to set up health benefit plan exchanges); *see also Cummings*, 596 U.S. at 219-20 (explaining that conditions on a Spending Power program must be imposed by Congress "unambiguously"); *Arlington Cent. Sch. Dist. Bd. of Educ.*, 548 U.S. at 296.

149.    The system crafted by Congress does not impose open-ended obligations on manufacturers. Instead, Congress designed a pervasive and integrated scheme of regulation through creation of a closed and limited system. Congress carefully defined those eligible to receive 340B drugs (enumerated covered entities), set the nature of the benefit (obligation to offer drugs), and imposed limitations on that benefit (to whom covered entities may furnish 340B-priced drugs). Congress spoke in exacting detail because maintaining a delicate balance in the 340B program, given its interconnection with other federal programs, is essential to ensure that the program achieves its purpose without becoming too onerous for manufacturers. Finally, Congress set out an exclusive federal enforcement scheme to maintain the federal programs as a harmonious whole. Each of these features reinforces that the 340B program is an area of dominant federal concern.

150.    H.B. 2048 nevertheless seeks to directly intrude on this carefully balanced federal program by expanding and materially altering the scope of manufacturers' obligations and rights, and by implementing a competing enforcement regime. That is far

more than 340B requires, permits, or contemplates. *Sanofi*, 58 F.4th at 703; *see also id.* at 706 (Third Circuit enjoining the federal government from mandating what Oklahoma is now attempting to do).

151.    That intrusion into the field of the operation of 340B is made clear by H.B. 2048's scope. Oklahoma pharmacies can freely order any drug available to them at market pricing. H.B. 2048 does not seek to expand or ensure access to drugs generally—it merely seeks to compel manufacturers to sell more of their drugs at 340B prices than they otherwise would, or than federal law requires. In so doing, Oklahoma attempts to forcibly insert itself into an arena occupied exclusively by the federal government (*i.e.*, 340B's reticulated scheme setting forth who can receive 340B-priced drugs).

152.    Oklahoma thus seeks to impose its own obligations on any manufacturer that agreed to accept federal funds. But states do not have the power to impose additional conditions on participation in federal programs, particularly those enacted under Congress's Spending Power, unless Congress authorizes them to do so, which Oklahoma does not and cannot claim Congress has done here. *See supra* ¶¶ 2-12, 126-27, 143-44, 149-50.

153.    H.B. 2048's imposition of additional obligations and a separate enforcement scheme is accordingly preempted as an impermissible intrusion into a federally dominated field and into a federal program created under Congress's Spending Power authority. *Cf. Boyle*, 487 U.S. at 507-08 (In the context of contracts with the federal government, the "conflict with federal policy need not be as sharp as that which must exist for ordinary pre-

emption," instead that unique context "changes what would otherwise be a conflict that cannot produce pre-emption into one that can.").

154.    H.B. 2048 is also conflict preempted.  A state law is conflict preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000), "interferes with the methods by which the federal statute was designed to" achieve those purposes and objectives, *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987), or interferes with a private party's rights conferred by federal law.  *Murphy v. NCAA*, 584 U.S. 453, 477-78 (2018).  A conflict exists between 340B, on the one hand, and H.B. 2048, on the other, for several reasons.

155.    H.B. 2048 disregards and conflicts with careful limitations, including the offer-and-acceptance regime chosen by Congress, designed to maintain the delicate balance struck by Congress.  As to covered entities, Congress sharply limited what they could do with 340B-priced drugs, prohibiting covered entities from reselling or transferring them to anyone other than their own patients.  42 U.S.C. § 256b(a)(5)(B).  As to manufacturers, 340B requires only that manufacturers "offer" 340B-priced drugs to covered entities (*i.e.*, that they provide some meaningful path for covered entities to access these medications).  *See id.* § 256b(a)(1); *Novartis*, 102 F.4th 460-64; *Sanofi*, 58 F.4th at 703.  The offers can include reasonable conditions, including both one-contract-pharmacy restrictions and a requirement that claims data be provided.  *Novartis*, 2021 WL 5161783, at *8 (holding that, under federal law, manufacturers are permitted to require certain types of data as a precondition of their "offer" of 340B-priced drugs); *id.* ("For its part, [the

plaintiff manufacturer] convincingly argues that the claims data conditions that it has added to its new 340B policy will enable it to better utilize the anti-fraud audit and ADR procedures that Congress established for manufacturers in Section 340B."); *Novartis*, 102 F.4th at 463-64 (affirming holding); *Sanofi*, 58 F.4th at 704. Finally, Congress provided for an exclusive enforcement regime, which includes (among other things), the right of manufacturers to audit a covered entity. 42 U.S.C. § 256b(a)(5)(C).

156. H.B. 2048's rewriting of the federal program's terms conflicts with the 340B statute in multiple ways and so is preempted. To name just a few, non-exhaustive examples:

157. *First*, H.B. 2048 reworks manufacturers' obligations under the federal program by disregarding Congress's offer-and-acceptance regime, among other things. Oklahoma is now seeking to impose as a matter of state law a bar on conditions for contract pharmacy use, a bar even the federal government has been enjoined from levying. *Sanofi*, 58 F.4th at 706; *see also Novartis*, 102 F.4th at 463-64 (explaining these reasonable conditions can be included as part of a manufacturer's 340B offer). By rewriting the terms of the required federal offer and barring manufacturers from including these conditions, H.B. 2048 dramatically expands manufacturers' obligations under a federal program to provide 340B-priced drugs. *Int'l Paper*, 479 U.S. at 494; *Villas at Parkside*, 726 F.3d at 531 (laws that "interfere[] with the careful balance struck by Congress" are conflict preempted). As courts have recognized, this expansion of obligations under a federal incentive program is preempted. *Forest Park II*, 336 F.3d at 732-33 (holding states may not impose additional obligations on participants in incentive-based, federal programs,

even where the federal statute does not explicitly bar such additional obligations). Oklahoma's efforts both conflict with the plain text of 340B's requirements and stand as an obstacle to the carefully circumscribed and federally managed closed system Congress created. *See AbbVie* Order at 11-16 (holding H.B. 2048 was likely preempted because it forced more sales at the 340B price and thus conflicted with Congress's "delicate balance" for 340B).

158.    Nor can H.B. 2048 be saved by recasting it as a distribution requirement. Oklahoma is attempting to dictate to whom manufacturers must *sell* 340B-priced drugs, not just to whom those drugs must be "delivered" or "distributed." But for Oklahoma's law, many manufacturers would not agree to sell drugs at 340B prices to covered entities and contract pharmacies for dispensing by contract pharmacies to the covered entity's patients if the covered entity refuses to comply with manufacturers' contract pharmacy limitations. *AbbVie Order* at 14 (H.B. 2048 "isn't really regulating the delivery of drugs to those contract pharmacies, but rather the *price* at which those drugs must be sold"); *id.* at 13 (recognizing H.B. 2048's "practical effect" is to "require[] manufacturers to delivery drugs to contract pharmacies at a discounted price when they would otherwise be delivered at full price").

159.    Of course, that does not mean that either covered entities or contract pharmacies cannot get those drugs. They just have to engage in commercial negotiations to purchase them at agreed-upon prices.

160.    H.B. 2048 is thus not really about delivery or distribution at all; it is about the price covered entities and contract pharmacies have to pay for drugs. The whole point

of the law is to force manufacturers to provide those same drugs to those same covered entities and pharmacies *at a lower price*.  *Id.* at 13 (H.B. 2048 is about Oklahoma "want[ing] drug manufacturers to maximally subsidize Oklahoma covered entities"); *Morrisey*, 760 F. Supp. 3d at 455-56 (recognizing that similar state statute was actually about forcing manufacturers to provide 340B pricing, not about delivery).  Indeed, if H.B. 2048 did not compel those sales at 340B prices, then there would be no 340B-priced drugs to deliver, and the law would be meaningless.  *See* H.B. 2048 §§ 2(1), (2) ("'340B entity' means an entity participating or authorized to participate in the federal 340B drug discount program, as described in Section 256b of Title 42 of the United States Code, including its pharmacy, or any pharmacy contracted with the participating entity to dispense drugs purchased through the 340B drug discount program"; "'340B drug' means a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to Section 256b of Title 42 of the United States Code and is purchased by a covered entity as defined in Section 256b(a)(4) of Title 42 of the United States Code").

161.    And the text of H.B. 2048, as well as how 340B operates, makes clear that H.B. 2048 does not simply enact a delivery requirement but instead seeks to force sales at the 340B price where they would not otherwise occur under federal law.  It applies to "340B drugs," defined with reference to the 340B program and sweeping in drugs that have "been subject to any offer for reduced prices by a manufacturer pursuant to Section 256b of Title 42 of the United States Code and [are] purchased by a covered entity."  H.B. 2048 § 2(1).  As explained, unless a covered entity (or a contract pharmacy purporting to act on its behalf) accepts a manufacturer's reasonable conditions on its 340B offer, the

manufacturer does not have to sell the drugs to the covered entity or any contract pharmacy acting on its behalf at the 340B price for dispensing by the contract pharmacy to the covered entity's patients. *See supra* ¶¶ 101, 108, 158. So either H.B. 2048 is ineffective (if it actually does only impose a delivery requirement on completed 340B purchases) because no 340B purchase occurs absent acceptance of a manufacturer's reasonable conditions, or Oklahoma is seeking to force additional 340B transactions that are not required under federal law. H.B. 2048 thus explicitly acts as a regulation of pricing.

162. Specifically, to even order a drug at a 340B price, a covered entity must first agree to reasonable conditions that are part of a drug manufacturer's offer, including, for example, one-contract-pharmacy and claims data conditions. *Novartis*, 102 F.4th at 460-64 (recognizing that such conditions are permissible under federal law). If the covered entity agrees, it may purchase the drug at the 340B price. If it does not, the 340B offer is rejected and a purchase at the 340B price cannot occur. *Id.* In other words, if the buyer does not accept those conditions when attempting to place a 340B order, *there is no order placed and no 340B purchase.*

163. H.B. 2048, however, forces manufacturers to provide the 340B price on drugs that have not been lawfully ordered as part of the federal 340B program. H.B. 2048 thus seeks to compel drug manufacturers to make *340B-priced sales* in situations and under circumstances that federal law does not require.

164. *Second,* Oklahoma's prohibition on manufacturers "interfer[ing] with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity, unless such receipt is prohibited by the United States Department of Health

and Human Services," is preempted by 340B and HHS's Rebate Model Pilot Program under it. H.B. 2048 § 4(A). This prohibition seemingly bars manufacturers from even gathering information such as claims data related to the 340B program. If those limits to gathering information stand, they will essentially break the federal remedial regime. *See AbbVie* Order at 17-18 (holding the barrier to accessing claims data that H.B. 2048 erects "stands in direct conflict with the 340B Program's dispute resolution mechanism"); *Morrisey*, 760 F. Supp. 3d at 450-53 (holding similar state law that barred collection of claims data was preempted because it conflicted with manufacturers' 340B audit rights); *Eli Lilly*, 2025 WL 1423630, at *2-4, *12-14 (affirming manufacturers' right to "impose data-reporting conditions on covered entities," explaining why claims data is important to maintaining program integrity, and requiring federal agency to take it into account when considering how manufacturers can structure their program participation).

165.   Under the remedial regime Congress crafted, manufacturers must first audit a covered entity before initiating ADR. *See* 42 U.S.C. §§ 256b(a)(5)(C), (d)(3)(B)(iv). However, manufacturers are only permitted to conduct an audit if they "ha[ve] documentation which indicates there is reasonable cause." 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996).

166.   "Reasonable cause" is defined to mean "that a reasonable person could believe that a covered entity may have violated" the prohibition on transfer or sale, or the prohibition on duplicate discounting. *Id.* Accordingly, to even access the audit process to engage in an ADR proceeding, manufacturers must be able to access information that will

allow them to determine if reasonable cause exists to suspect a covered entity is violating 340B's provisions.

167.    Additionally, to avoid providing duplicate discounts under the IRA, manufacturers need claims level data.  *See supra* ¶¶ 119-24.

168.    Manufacturers' policies to collect such data are in line with general "business practices" and collect "standard information."  *Novartis*, 102 F.4th at 463 (claims data is in line with "business practices" and "standard information"); *Morrisey*, 760 F. Supp. 3d at 451 (noting the collection of such data is a "widespread industry practice").

169.    But Oklahoma's comprehensive bar on "interfer[ing] with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity, unless such receipt is prohibited by the United States Department of Health and Human Services," has the potential effect of limiting manufacturers' access to evidence of federal violations and handicapping manufacturers from being able to meaningfully utilize the federal resolution process that Congress provided.  *See* H.B. 2048 § 4(A).  This creates a direct conflict with the federal regime.  As the *Morrisey* court stated: "By restricting the very method by which data collection is made, [the state statute] frustrates drug manufacturers' ability to take the initial steps necessary to start the very audit required to access" ADR and thus "stands as an obstacle to achieving the federal objective of preventing fraud in" 340B.  760 F. Supp. 3d at 453.

170.    Nor is it any answer that manufacturers could request claims data on a voluntary basis.  Covered entities have fiercely resisted efforts to provide claims data to manufacturers.  In 2020, when a manufacturer attempted to gather claims data on a

voluntary basis, 340B Health, an association representing over 1,600 340B covered entity participants, informed its members that they had "no legal obligation" to provide data and that "noncompliance" with the request was "unlikely to result in audits," in part because the manufacturer "could not feasibly audit the thousands of covered entities that received its letter."  340B Health, *Hospitals Should Consider Legal & Operational Burdens Imposed by Merck's Request for Data that there is No Legal Obligation under 340B to Provide* 1, 4-5 (July 20, 2020), https://tinyurl.com/2xrz5w8p.  On information and belief, covered entities have refused and continue to refuse to provide claims data to manufacturers on a voluntary basis in the absence of claims data requirements.

171.   The conflict is reinforced by H.B. 2048's impact on rooting out duplicate discounting.   Under the new Medicare Drug Price Negotiation Program, HHS is to "negotiate" with manufacturers the "maximum fair price[s]" for certain drugs.  42 U.S.C. § 1320f-3(a).   Manufacturers must provide access to selected drugs at the so-called maximum fair prices, except when such selected drugs are 340B-eligible and the 340B price is lower.  *Id.* § 1320f-2(d).  To avoid duplicating price reductions, this scheme necessarily requires identifying when a specific drug is acquired at the 340B price, a burden CMS places on manufacturers.[12]   As a result, manufacturers need claims data to avoid providing duplicative price reductions.  And to utilize this information to avoid providing

---

[12] CMS, Medicare Drug Pricing Negotiation Final Guidance 57-58, 60 (Oct. 2, 2024) (stating CMS "will not assume responsibility for deduplicating discounts" and that manufacturers bear that burden), https://tinyurl.com/3sx8hmah.

duplicate discounts, manufacturers need it to be provided contemporaneously or close in time to the dispensing of the drug. Yet, H.B. 2048 would bar its collection.

172. The bar on collection of claims data also directly conflicts with HHS's Rebate Model Pilot Program, which makes clear that manufacturers may collect certain types of claims data, including for use in their rebate models. *See supra* ¶¶ 121-24, 164.

173. Oklahoma's approach stands in stark contrast to other courts' recognition of the conflict posed between claims data restrictions and federal law, *see PhRMA v. Fitch*, No. 24-cv-160, 2024 WL 3277365, at *10 (S.D. Miss. July 1, 2024), as well as other states' express disclaiming of any attempt to punish claims data policies, *see* Br. for Miss. at 31-32, *PhRMA v. Fitch*, No. 24-60340 (5th Cir. Nov. 8, 2024) ("Section 340B entitles drug makers to claims data. HB 728 honors that entitlement."), ECF No. 22; Br. for Md. at 29, *PhRMA v. Brown*, No. 1:24-cv-01631 (D. Md. July 2, 2024), ECF No. 19-1; *cf.* Hawaii H.B. 712 Sec. 2, § 2(b) (exemption for claims data used to detect 340B violations).

174. *Third*, H.B. 2048's broad prohibitions also appear aimed at preventing manufacturers from using what is known as the rebate model. Under those models generally, manufacturers will provide rebates when covered entities submit a 340B-rebate claim to the manufacturer, rather than sell the 340B-priced drugs at an upfront reduced price. H.B. 2048 attempts to prevent their use despite the federal statute providing for the use of rebates and the fact that the federal government has already explicitly blessed use of rebate models for certain covered entities, known as AIDS Drugs Assistance Programs. *See* 42 U.S.C. § 256b(a)(1); 63 Fed. Reg. 35,239, 35,240 (June 29, 1998). This prohibition is included despite a recent federal court decision that makes clear rebate models are

permitted and the new federal Rebate Model Pilot Program, which explicitly allows certain manufacturers, including PhRMA members, to use rebate models. *See supra* ¶¶ 121-24, 164 (discussing approvals).

175. *Fourth*, H.B. 2048's state-law enforcement provisions conflict with the carefully calibrated system created by Congress to ensure 340B compliance and raise the specter of inconsistent adjudications. *See AbbVie* Order at 16-17, 18-20 (holding H.B. 2048 was likely preempted because it impinged on federal government's exclusive enforcement authority and threatened inconsistent adjudications on federal law issues); *Morrisey*, 760 F. Supp. 3d at 453-60 (holding similar state law was likely preempted because it conflicted with 340B's enforcement regime); *Astra*, 563 U.S. at 113; *Buckman*, 531 U.S. at 349-50 (where agency had "a variety of enforcement options that allow it to make a measured response," greenlighting state-law tort claims would "inevitably conflict with the [agency's] responsibility to police fraud consistently with [its] judgment and objectives"). In *Astra*, covered entities operated by Santa Clara County brought suit to enforce 340B pricing against drug manufacturers directly rather than bringing that issue to HHS. *See* 563 U.S. at 116-17. Two things happened. First, in response to such disputes, Congress stepped in and amended the 340B statute to add detailed administrative enforcement mechanisms—all to be overseen by HHS, subject to federal court review. 42 U.S.C. § 256b(d). Second, the Supreme Court ruled against Santa Clara County, explaining that the new federal agency administrative enforcement mechanisms were the "proper remedy" for disputes about the operation of 340B. *Astra*, 563 U.S. at 119-22. The

Court stressed repeatedly that it was essential 340B be administered "harmoniously and on a uniform, nationwide basis." *Id.* at 120.

176.    H.B. 2048 conflicts with that regime in multiple ways.  Like the claims considered in *Astra*, H.B. 2048 conflicts with the federal enforcement regime by usurping HHS's unitary enforcement authority.  Federal ADR regulations issued in 2024 make clear HHS's view that it has federal statutory authority to address the same issues as H.B. 2048, including through ADR.  *See* 89 Fed. Reg. at 28,649 (defining overcharge claim, to be brought via ADR, to encompass "a claim that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price or the manufacturer does not offer the 340B ceiling price"); *see also supra* ¶ 117 (discussing recent ADR decision addressing these very same issues and finding contract pharmacy policy does not violate 340B).  In other words, the federal government believes it has authority to address the same issues that H.B. 2048 purports to regulate—when and under what terms 340B-priced drugs must be provided.  *Id.*; 42 U.S.C. § 256b(d)(1) (covering "overcharges and other violations of the discounted pricing requirements").  And the federal government has explicitly stated that "*Astra* left no doubt that 'Congress directed [HHS] to create [ADR]' in order 'to make [ADR] the proper remedy for covered entities' complaining of 340B violations,'" specifically "dispute[s] over contract-pharmacy restrictions."  Gov. Reply Br. at 5, *Am. Hosp. Ass'n v. HHS*, No. 3:20-cv-08806 (N.D. Cal. Feb. 1, 2021), ECF No. 82.  Yet Oklahoma seeks to address the very same dispute, contra to *Astra*.  *AbbVie* Order at 18-19 (recognizing that H.B. 2048 polices overcharges in contravention of *Astra*); *Morrisey*, 760 F. Supp. 3d at 453-59; *Gould Inc.*, 475 U.S. at 286

("[C]onflict is imminent whenever two separate remedies are brought to bear on the same activity.").

177.    A preview of potential state enforcement proceedings drives the impermissible conflict home.  Oklahoma has tied H.B. 2048 to 340B.  Accordingly, determining whether a manufacturer violated H.B. 2048 requires determining if there was an underlying 340B obligation in the first place.  To make the latter determination, a decisionmaker will need to answer several federal law questions, including whether:  (1) a particular covered entity has permissibly contracted with a contract pharmacy under federal law and has the necessary "principal-agent" relationship required to even arguably comply with federal law, 42 U.S.C. §§ 256b(a)(5)(A)-(B); (2) the covered entity continues to "hold title" to the 340B-priced drugs throughout all relevant transactions (which does not occur under the prevailing product "replenishment model"); (3) all of the individuals receiving 340B-priced drugs meet the federal definition of a 340B patient; (4) the particular prescriptions at issue qualify for 340B prices; and (5) the 340B price reductions are duplicative of Medicaid rebates applicable to the same prescriptions, *id.* § 256b(a)(5)(A).  A state adjudicator will also be required to determine if a covered entity continues to qualify for participation in the federal program.  For example, a covered entity that sells or transfers 340B-priced drugs to anyone other than its patients is no longer eligible to receive 340B-priced drugs.  *Id.* § 256b(a)(5); *Eli Lilly*, 2025 WL 1423630, at *2 (noting requirements for an individual to qualify as a patient of a covered entity).  Similarly, covered entities violating prohibitions on duplicate discounts are ineligible to receive 340B-priced drugs.  42 U.S.C. §§ 256b(a)(4)-(5); *see Morrisey*, 760 F. Supp. 3d at 458-59.

178.    H.B. 2048 also skews the carefully balanced enforcement scheme enacted by Congress.  Congress specified certain limited civil penalties that could be levied in limited circumstances.    42 U.S.C. § 256b(d)(1)(B)(vi)(II) (setting a maximum of $5,000 per violation, subject to inflation).  H.B. 2048 imposes penalties, including a penalty of up to $10,000 for each violation, with "[e]ach time a prohibited act is committed" constituting a separate violation.  H.B. 2048 § 5.  And it permits the Attorney General to prosecute manufacturers for potential criminal liability as well.  *See supra* ¶ 131.  The layering on of additional adjudicators and penalties wildly unbalances Congress's system, and threatens the same inconsistent adjudications identified in *Astra* because Oklahoma cannot enforce H.B. 2048 without adjudicating multiple questions of federal law.  *AbbVie* Order at 19-20 (recognizing this issue).

179.    H.B. 2048 also expands the obligations of HHS, the agency that oversees the program.  That agency already must police covered entities' relationships with contract pharmacies and will now have to police a greater universe of transactions.  This also directly interferes with the federal 340B program.  *See Morrisey*, 760 F. Supp. 3d at 450-53.

180.    *Finally*, H.B. 2048 frustrates the "accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), in various ways in addition to those described above.  For example, by purporting to impose additional, onerous terms and limitations on 340B (which the Third Circuit has held not even the federal government can impose), H.B. 2048 increases the cost of manufacturer participation in the federal Medicare Part B and Medicaid programs.  And H.B. 2048's

mandate will contribute to duplicate discounts and diversion of 340B drugs to ineligible recipients, both of which the federal scheme forbids.

181.    For all of these reasons and more, H.B. 2048 is preempted, and its enforcement should be enjoined.

## CLAIM II
### (Declaratory/Injunctive Relief—Unconstitutional Extraterritorial Regulation)

182.    PhRMA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

183.    Under our constitutional framework, states may not directly regulate conduct that takes place wholly in another state.  "[A]ll States enjoy equal sovereignty."  *Shelby Cnty. v. Holder*, 570 U.S. 529, 535 (2013).  "A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) (citation omitted).

184.    While the Supreme Court recently clarified that state laws regulating conduct within the state's borders in a way that might have an "extraterritorial effect" in other states are not categorically barred, it made clear that it was not addressing a state law that "directly regulated out-of-state transactions."  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374, 376 n.1 (2023).  The understanding that states may not impose on other states' regulatory powers follows from several Constitutional provisions.  States are denied certain powers that a sovereign might ordinarily impose, U.S. Const. art. I, § 10,and

required to honor certain rights of other states, U.S. Const. art. IV, §§ 1-3.  Similarly, the Due Process Clause limits a state's ability to regulate conduct occurring wholly outside its borders.  *See Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954) (recognizing "the due process principle that a state is without power to exercise 'extra territorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries"); *Home Ins. Co. v. Dick*, 281 U.S. 397, 407-08 (1930) (similar).

185.    Most notably, the Commerce Clause provides that "[t]he Congress shall have Power . . . To regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3.    Under that clause, states are prohibited from directly "control[ling] commerce occurring wholly outside [their] boundaries." *Pork Producers*, 598 U.S. at 373 & n.1; *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality op.).

186.    H.B. 2048 is unconstitutional under these principles.  H.B. 2048 broadly bans all pharmaceutical manufacturers—many of whom have no physical presence in Oklahoma—from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity."  H.B. 2048 § 4(A).

187.    None of PhRMA's members are headquartered in Oklahoma.

188.    Drug manufacturers, including PhRMA's members, primarily sell their drugs that end up in Oklahoma through distributors, who are also located outside of Oklahoma.

189.    Those initial transactions between out-of-state manufacturers and out-of-state distributors occur entirely outside of Oklahoma.

190.    These out-of-state distributors then sell drugs to healthcare facilities, some of which are located in Oklahoma.

191.    Additionally, in some circumstances where an Oklahoma covered entity or pharmacy receives the 340B price on a drug from an out-of-state distributor, the out-of-state distributor then seeks the difference between the lower 340B price and the original price paid by the out-of-state distributor to the out-of-state manufacturer, including PhRMA's members, in a subsequent transaction.  That subsequent transaction (known as a "chargeback") also occurs wholly outside Oklahoma.

192.    As a result, H.B. 2048 regulates conduct occurring wholly beyond the borders of Oklahoma, including transactions between manufacturers and distributors.  Not only will H.B. 2048 require manufacturers to provide the 340B price on out-of-state transactions of manufacturers with distributors, it will also, given the offer-and-acceptance regime, force manufacturers to enter into many 340B transactions that they otherwise would not.  In sum and substance, H.B. 2048 tells out-of-state manufacturers that they cannot condition their upstream sales to out-of-state distributors at the 340B price on compliance with contract pharmacy policies.

193.    H.B. 2048 is also discriminatory.  It privileges in-state interests by providing them monetary benefits not contemplated by Congress, while imposing a significant burden on out-of-state manufacturers.

194.    By directly regulating commerce that occurs entirely outside of its borders, H.B. 2048 violates the Constitution's bar on extraterritorial state regulation.  *See Ellison,* 140 F.4th at 958-62 (affirming preliminary injunction of a Minnesota law that barred

manufacturers from "impos[ing], or caus[ing] to be imposed, an excessive price increase, whether directly or through a wholesale distributor, pharmacy, or similar intermediary, on the sale of any generic or off-patent drug sold, dispensed, or delivered to any consumer in the state"); *Styczinski v Arnold*, 46 F.4th 907 (8th Cir. 2022) (same as to Minnesota law that regulated transactions with a "consumer who lives in Minnesota" because a trader could violate the law "without conducting a single transaction in Minnesota"); *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 666-71 (4th Cir. 2018) (striking down a Maryland drug-pricing law that "directly regulates the price of transactions that occur outside Maryland[,]" where the law allowed "Maryland to enforce the Act against parties to a transaction that did not result in a single pill being shipped to Maryland").

### CLAIM III
### (Declaratory/Injunctive Relief—Due Process Clause)

195.    PhRMA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

196.    The Fourteenth Amendment's Due Process Clause provides that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

197.    Under the Due Process Clause, a statute is unconstitutionally vague if "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1233 (10th Cir. 2023) (citation omitted).

198.    Where, as here, a statute imposes criminal in addition to civil penalties, concerns about vagueness are at their zenith.  As the Supreme Court has instructed: "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498-99 (1982); *see also Winters v. New York*, 333 U.S. 507, 515 (1948).  Laws imposing criminal penalties are subject to a more exacting standard because the "consequences of imprecision" are particularly "severe" when a law imposes criminal penalties.  *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018); *see also Hoffman Ests.*, 455 U.S. at 498-99.

199.    This is also true where First Amendment interests are implicated.  Indeed, when a statute "is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 572-73 (1974) (considering First Amendment implications in applying due process vagueness analysis); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012) (stricter application of vagueness doctrine is appropriate where statute involves speech in order "to ensure that ambiguity does not chill protected speech"); *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms." (internal quotation marks and citations omitted)).

200.    H.B. 2048 broadly states that "[a] manufacturer shall not interfere with" (A) "the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity, unless such receipt is prohibited by the United States Department of Health and Human Services,"

or (B) "a pharmacy contracted with a 340B entity."  H.B. 2048 §§ 4(A)-(B).  H.B. 2048 does not define the term "interfere."  *Cf. Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 786 (4th Cir. 2023) (affirming district court grant of summary judgment to plaintiffs where law prohibited "interfer[ing] with or . . . disturb[ing] in any way or in any place the students or teachers of any school or college in this State" and noting that "[i]t is hard to know where to begin with the vagueness problems with th[e] statute"); *United States v. Elliot*, No. 2:17-cr-33, 2018 WL 11478272, at *1, *3 (N.D. Ga. Aug. 8, 2018) (concluding regulation that prohibited "[a]ny act or conduct by any person which interferes with, impedes or disrupts the use of the project" was unconstitutionally vague as applied); *Corp. of Haverford Coll. v. Reeher*, 329 F. Supp. 1196, 1208-09 (E.D. Pa. 1971) *supplemented*, 333 F. Supp. 450 (E.D. Pa. 1971) (collecting cases where prohibitions on interference were deemed unconstitutionally vague).

201.    Manufacturers, including PhRMA's members, are entitled to publicize information about unlawful transfers or duplicate discounting occurring at particular contract pharmacies or covered entities, to audit covered entities and their records relating to contract pharmacies, to file complaints in the context of the federal system that Congress created, and to seek information regarding contract pharmacies.  But H.B. 2048's prohibition on "interference" would seem to bar them from doing so.  Uncertainty as to the scope of prohibited conduct and speech under H.B. 2048 is the precise problem with vague laws.

## **PRAYER FOR RELIEF**

PhRMA respectfully prays that this Court:

a.    issue an order and judgment declaring that H.B. 2048 is unconstitutional and violates federal law;

b.    issue an order and judgment declaring that H.B. 2048's provisions are unlawful as to PhRMA's members' covered outpatient drugs offered through the 340B Drug Pricing Program;

c.    enjoin, preliminarily and permanently, the implementation and enforcement of H.B. 2048 against PhRMA's members and members' affiliates, officers, agents, representatives, or contractors;

d.    enjoin, preliminarily and permanently, the implementation and enforcement of H.B. 2048 as to the sale of PhRMA's members' drugs;

e.    award PhRMA costs and reasonable attorneys' fees, as appropriate; and

f.    grant any other relief the Court finds just and appropriate.

Dated:  November 3, 2025                 Respectfully submitted,

                                         s/ *Trevor S. Pemberton*
                                         Trevor S. Pemberton, OBA #22271
                                         PEMBERTON LAW GROUP PLLC
                                         600 North Robinson Avenue, Suite 308
                                         Oklahoma City, OK 73102
                                         P: (405) 501-5054
                                         trevor@pembertonlawgroup.com

                                         *Attorney for Plaintiff*